**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number: 2010-NMSC-013

Filing Date: March 19, 2010

Docket No. 31,268

ALBUQUERQUE BERNALILLO
COUNTY WATER UTILITY AUTHORITY,

       Appellant,

v.

NEW MEXICO PUBLIC REGULATION COMMISSION,

       Appellee,

and

PUBLIC SERVICE COMPANY OF NEW MEXICO, ET AL.,

       Intervenors.

<u>Consolidated with:</u>

Docket No. 31,273

NEW MEXICO INDUSTRIAL ENERGY CONSUMERS,

       Appellant,

v.

NEW MEXICO PUBLIC REGULATION COMMISSION,

       Appellee,
and

PUBLIC SERVICE COMPANY OF NEW MEXICO
and ATTORNEY GENERAL OF THE STATE OF NEW MEXICO,

       Intervenors.

1

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

Sheehan, Sheehan & Stelzner, P.A.
Nann M. Winter
Albuquerque, NM

for Appellant Albuquerque Bernalillo County Water Utility Authority

Peter Jude Gould
Santa Fe, NM

for Appellant New Mexico Industrial Energy Consumers

Robert Y. Hirasuna
Margaret Caffey-Moquin
David P. Barton
Santa Fe, NM

for Appellee

Patrick T. Ortiz
Benjamin Phillips
Albuquerque, NM

Miller Stratvert, P.A.
Robert H. Clark
Albuquerque, NM

for Intervenor Public Service Company of New Mexico

## OPINION

**MAES, Justice.**

**{1}** Albuquerque Bernalillo County Water Utility Authority (ABCWUA) and New Mexico Industrial Energy Consumers (NMIEC) appeal from the Final Order of the New Mexico Public Regulation Commission (the PRC), claiming that the PRC improperly awarded an emergency fuel and purchased power cost adjustment clause to the Public Service Company of New Mexico (PNM) under NMSA 1978, Section 62-8-7(E)(1) (2003, as amended through 2007) and 17.9.550.1 to 550.17 NMAC (Recompiled 12/30/2001) (hereinafter Rule 550). We affirm the Final Order of the PRC.

## I.      FACTS AND PROCEDURAL HISTORY

**{2}**      On February 21, 2007, PNM filed a rate case with the PRC seeking a rate increase and a fuel and purchased power cost adjustment clause (FPPCAC) pursuant to Section 62-8-7(E)(1) and Rule 550. A FPPCAC "flow[s] through to the users of electricity the increases or decreases in Applicable Fuel and Purchased Power costs," Rule 550.6(D) NMAC and, therefore," provide[s] for the stability of utility earnings when electric fuel costs and purchased power costs are rising and permit[s] prompt credits to customers when electric fuel costs and purchased power costs are declining." Rule 550.6(B). Rule 550.17(A)(1)-(3) provides that "[n]o utility shall have a FPPCAC included in its tariff" unless the utility demonstrates that

(1)      the cost of fuel and purchased power are a significant percentage of the total cost of service;
(2)      the cost of fuel and purchased power contains costs which periodically fluctuate and cannot be precisely determined in a rate case;
(3)      the utility's fuel and purchased power policies and practices are designed to assure that electric power is generated and purchased at the lowest reasonable cost.

*See also* § 62-8-7(E)(1) (providing that FPPCACs must be "consistent with the purposes of the Public Utility Act, including serving the goal of providing reasonable and proper service at fair, just and reasonable rates to all customer classes").

**{3}**      The PRC assigned the case to a hearing examiner. *See* NMSA 1978, § 8-8-4(C)(3)(a) (1998). On March 6, 2008, following extensive discovery and two weeks of hearings, the hearing examiner issued a Recommended Decision, which included proposed findings and a recommendation that PNM's request for a FPPCAC should be denied because PNM had failed to fulfill the regulatory requirements set forth in Rule 550. Specifically, the hearing examiner found that (1) it is doubtful whether PNM's fuel and purchased power costs constitute a significant percentage of the total cost of service, (2) PNM failed to establish that its fuel mix "consists of fuels with volatile or [fluctuating] prices" and that "its fuel and purchased power costs are so unpredictable that they cannot be calculated in a rate case and call for an FPPCAC instead," and (3) the proposed FPPCAC fails to provide reasonable and proper service at fair, just and reasonable rates and is not designed to ensure that electric power is generated and purchased at the lowest reasonable cost. *See* Rule 550.17(A)(1)-(3). Thirteen days later, PNM filed exceptions to the Recommended Decision, claiming, in relevant part, that it was entitled to a FPPCAC under Rule 550. *See* 1.2.2.37(C)(1)(a) NMAC (09/01/2008).

**{4}**      On March 20, 2008, PNM and the International Brotherhood of Electrical Workers,

Local No. 611, filed a joint motion requesting an Emergency FPPCAC.[1]  Attached to the joint motion was the affidavit of Charles N. Eldred, Executive Vice President and Chief Financial Officer of PNM. Eldred averred that, following the issuance of the Recommended Decision rejecting PNM's request for a FPPCAC, PNM's credit rating was downgraded, its stock price hit a fifty-two week low, and it was unable "to access the commercial paper market" or "to issue long term debt."   Eldred expressed his belief that a FPPCAC "is absolutely necessary if PNM is to avoid further deterioration of its credit rating to junk bond status."

**{5}**     The Emergency FPPCAC differed materially from the FPPCAC previously submitted to the hearing examiner.  Specifically, the Emergency FPPCAC contained the following conditions suggested by the Attorney General and the PRC's Utility Division Staff (Staff): "(a) . . . prior approval of purchased power agreements ('PPAs') with terms greater than one year; (b) replacement power due to plant outages [would] not be recovered through the FPPCAC; and, (c) demand charges [would] not be recovered through the FPPCAC." Additionally, the Emergency FPPCAC contained other

> conditions which are designed to mitigate the impact on customer bills during peak periods and provide additional incentives to PNM management to control costs to the extent they are controllable.  Among them are that the fuel factor charged pursuant to the Emergency FPPCAC will be capped at $.01 per [kilowatt] and that replacement power costs due to plant availability lower than a weighted average plant availability factor cannot be recovered without prior approval of the [PRC].  Also included in the Emergency FPPCAC is a condition that all costs recovered through it will be subject to audit and refund if the costs are determined by the [PRC] to have been imprudently incurred.

**{6}**     In light of the serious financial concerns raised by PNM, the PRC established the following expedited procedural schedule for the consideration and review of the Emergency FPPCAC.

| | |
|---|---|
| Public Notice | March 31, 2008 |
| PNM Direct Testimony | March 28, 2008 |
| Deadline for intervention | April 8, 2008 |
| Staff/Intervenor Testimony | April 9, 2008 |
| PNM Rebuttal Testimony | April 14, 2008 |
| Hearing | April 15, 2008 |

Additionally, the PRC severed the Emergency FPPCAC from the underlying rate case,

---

[1]The International Brotherhood of Electrical Workers, Local No. 611 is not a party to this appeal.

reasoning that "the Emergency FPPCAC essentially is a new FPPCAC that is significantly different from the FPPCAC [previously] proposed by PNM" and that "the record [in the rate case] is now closed."[2] Although the PRC established a new docket number for the Emergency FPPCAC, No. 08-00092-UT, it noted that it would, "of course, take administrative notice of any evidence relevant to the Joint Motion and the Emergency FPPCAC that is in [the rate case] to the extent permitted by 17.1.2.37(D) NMAC." The PRC also ordered PNM to address certain issues in its direct testimony and suspended the implementation of the Emergency FPPCAC "until and including May 7, 2008."

**{7}** ABCWUA and NMIEC filed objections to the expedited procedural schedule and a joint motion for extension of time, requesting sixty days from the filing of PNM's direct testimony to file a response. Essentially, they requested "that the deadline for the filing of their testimony be extended to at least May 27, 2008, or approximately 48 days beyond the original April 9 deadline." ABCWUA and NMIEC claimed that the expedited procedural schedule did "not allow the Staff and Intervenors sufficient time to propound discovery and adequately analyze PNM's responses before the filing deadline for their own testimony," thereby effectively denying them due process of law. The PRC entered a procedural order extending the deadline five days, to April 14. Following oral argument, the PRC entered a second procedural order extending the deadline an additional twenty-five days, to May 9. The PRC found that "a 30-day, rather than the requested 48-day, extension of time from the original April 9 deadline for the filing of Staff and Intervenor testimony, should give Staff and Intervenors sufficient time, consistent with their due process rights, to take discovery and prepare their testimony."

**{8}** After holding public hearings from May 12 through May 17, 2008, a majority of the PRC Commissioners issued a Final Order granting PNM's request for an Emergency FPPCAC. First, the PRC found that PNM's fuel and purchased power costs constitute 20.167% of its total costs of service. Although the PRC had "not yet determined what constitutes a 'significant percentage' of a utility's total cost of service for the purposes of 17.9.550.17(A)(1)," applying the ordinary meaning of the term "significant," the PRC determined that "20% is a significant percentage of PNM's total cost of service." The PRC noted that its conclusion was bolstered by the fact that PNM's "Base Fuel Cost is the second largest category of cost" and, therefore, "a relatively small percentage change in those costs can have a significant impact on PNM."

**{9}** Second, the PRC found that PNM had "made the requisite showing that its purchased

---

[2]In the underlying rate case, PNM found it "unnecessary . . . to address the merits of the [original] FPPCAC" in light of "PNM's filing of the Emergency FPPCAC and the relatively expedited procedural schedule" attendant thereto. Although the PRC did not approve the original FPPCAC in its Final Order, it cautioned that its "disapproval should not be construed as adopting or approving any of the [Recommended Decision's] findings, conclusions, or orders."

power and fuel costs periodically fluctuate and cannot be precisely determined in a rate case." *See* Rule 550.17(A)(2). The PRC held that "Rule 550 does not require a showing that purchase power and fuel costs are 'volatile', or fluctuate more than some other cost of providing service." Accordingly, "[a]lthough PNM's coal and nuclear costs historically have fluctuated less than the cost of natural gas," the PRC determined that these costs, nonetheless, "'periodically fluctuate' under the plain meaning of that phrase." The PRC rejected ABCWUA's and NMIEC's assertions that PNM's fuel and purchased power costs are predictable, noting that neither ABCWUA nor NMIEC had identified "in any way . . . what those predictable future costs are and what methodology could be used to precisely determine[] those future costs in this or in any other rate proceeding."

**{10}** Lastly, to ensure that PNM's electric power is generated and purchased at the lowest reasonable cost, *see* Rule 550.17(A)(3), the PRC exercised its authority under Rule 550 to "impose the condition on the Emergency FPPCAC that PNM shall pay for the costs of a prudency review of its fuel and purchase power costs."[3] The PRC ordered that

> [t]he prudency review shall be conducted by an auditor or team of auditors to be selected by, and under the direction of, the [PRC]. The prudency review shall be commenced as soon as practicable after PNM implements its Emergency FPPCAC and shall continue until all of the costs flowed through to its customers under that FPPCAC have been subject to the review. All prudency review costs paid by PNM shall be treated as a regulatory asset by PNM and recovered from its ratepayers through the rates established in PNM's next general rate proceeding.

**{11}** The PRC rejected ABCWUA's and NMIEC's claim that the Emergency FPPCAC constitutes "piecemeal ratemaking" because it does not offset increases in PNM's fuel and purchased power costs against decreases in PNM's other costs. The PRC explained that "the Legislature, when it enacted [Section] 62-8-7(E), created a statutory exception to the general prohibition against piecemeal ratemaking by expressly giving the [PRC] the authority to promulgate rules governing the use of, among other matters, fuel and purchased power adjustment clauses." Additionally, the PRC noted that nearly "every utility in New Mexico has a fuel clause" and that "[n]o party in this case or in [the rate case] has presented any legal

---

[3]To further ensure that PNM's electric power is generated and purchased at the lowest reasonable cost, the PRC exercised its authority to order the following additional modifications of the Emergency FPPCAC: (1) the weighted average capacity factor, below which PNM may recover fuel and purchased power costs, "should be 86.4%, rather than the 82.9% proposed by PNM"; (2) "PNM should also be required to eliminate from the calculation of its FPPCAC Factor the effect of the SO2 allowance sales"; (3) significant up-front fuel and purchased power costs associated with PNM's Underground Coal Sales Contract with San Juan Coal Company, such as long wall moves, must be pro-rated "over the same period that such costs benefit its ratepayers."

or factual arguments to justify ignoring several years of precedent and treating PNM or the Emergency FPPCAC [differently] from all of these other utilities or their FPPCACs."

**{12}** The PRC also rejected ABCWUA's and NMIEC's claim that the Emergency FPPCAC, which recovers fuel purchased power costs through a uniform per kilowatt hour charge, results in unreasonable and inequitable rates. The PRC noted that its

> long-standing policy, as reflected in Rule 550, has been to require fuel and purchased power costs to be recovered on a uniform per kWh basis. As a result, every FPPCAC in effect in New Mexico recovers those costs in that manner. Adopting UNM's proposal would represent a significant and abrupt departure from that long-standing policy and practice that could affect the interests of other utilities and their ratepayers, and thus are beyond the scope of this proceeding.

**{13}** Two of the five PRC Commissioners did not join the Final Order. Commissioner Ben R. Lujan, PRC Chairman and representative for District 1, "Voted no" on the Final Order and Commissioner Jason Marks, representative for District 3, filed a dissent. Commissioner Marks agreed with the majority that "PNM has met the threshold statutory requirements for a fuel clause," but dissented from the Final Order because the Emergency FPPCAC failed to contain "an additional condition retaining a portion of the fuel and purchased power risk for PNM." Specifically, Commissioner Marks would have imposed "an 80/20 split on the fuel clause, with PNM being at risk for 20% of the difference between allowable fuel costs in its most recent rate case and currently claimed costs."

## II.    ISSUES ON APPEAL

**{14}** Following the denial of their motions for reconsideration, ABCWUA and NMIEC appealed directly to this Court from the Final Order of the PRC. *See* NMSA 1978, § 62-11-1 (1993) (providing a right of direct appeal from the final order of the PRC). ABCWUA and NMIEC raise a variety of claims, many of which overlap substantially. For the purpose of economy and clarity, we have combined their claims into two broad general categories enumerated below.

### A.    Constitutional Claims

**{15}** ABCWUA and NMIEC claim that the PRC deprived them of procedural due process of law in violation of the Fourteenth Amendment to the Federal Constitution because (1) the public notice, which emphasized PNM's dire financial condition, was inadequate and misleading because the PRC ultimately decided that PNM's financial condition was "not relevant to the issue of whether PNM should be granted the Emergency FPPCAC"; (2) the expedited procedural schedule did not provide sufficient time to allow for adequate discovery, review, or analysis of the Emergency FPPCAC; (3) Commissioners David King and Carol K. Sloan improperly failed to attend many of the proceedings, thereby depriving

ABCWUA of a full and fair opportunity to be heard; and (4) Commissioners King and Sandy Jones improperly failed to recuse themselves from the proceedings, thereby depriving NMIEC of a fair and impartial hearing. Additionally, ABCWUA claims that the PRC's failure to defer to the vote of the two dissenting Commissioners, who "represent a significantly greater number of PNM customers than the remaining three Commissioners," deprived the "customers in those districts [of] adequate representation and equal protection of the laws" in violation of the Fourteenth Amendment to the Federal Constitution.

## B.    Statutory and Regulatory Claims

**{16}**    ABCWUA and NMIEC also claim that the Emergency FPPCAC violates various state statutes and regulations governing public utilities. Specifically, ABCWUA and NMIEC claim that (1) the Emergency FPPCAC violates Section 62-8-7(E) because it is inconsistent "with the purposes of the Public Utility Act, including serving the goal of providing reasonable and proper service at fair, just and reasonable rates"; (2) the Emergency FPPCAC "discriminates against customers with the lowest cost responsibility," in violation of NMSA 1978, Section 62-8-6 (1993, prior to 2008 amendments); (3) the PRC improperly permitted PNM to treat the costs of the audit as a regulatory asset, thereby requiring consumers to pay twice for regulation, in violation of NMSA 1978, Section 62-8-8 (2005); (4) the independent audit lacks sufficient regulatory oversight, in violation of Rule 550; (5) PNM failed to file new schedules showing the proposed rate changes, in violation of Section 62-8-7(B); and (6) the Emergency FPPCAC violates Rule 550.17(A)(2), because PNM failed to establish that its "cost of fuel and purchased power contains costs which periodically fluctuate and cannot be precisely determined in a rate case."

## III.    STANDARD OF REVIEW

**{17}**    The party challenging the PRC's decision bears the burden to demonstrate that the decision "is arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law." *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n*, 2007-NMSC-053, ¶ 13, 142 N.M. 533, 168 P.3d 105 (*NMIEC*) (internal quotation marks and citation omitted); *see also* NMSA 1978, § 62-11-4 (1965) ("The burden shall be on the party appealing to show that the order appealed from is unreasonable, or unlawful."). In reviewing the PRC's decision, "we 'begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise.'" *NMIEC*, 2007-NMSC-053, ¶ 13 (quoting *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 120 N.M. 579, 582, 904 P.2d 28, 31 (1995)).

**{18}**    "With respect to questions of fact, we look to the whole record to determine whether substantial evidence supports the [PRC's] decision." *Id.* ¶ 24.

In reviewing the whole record, the court must be satisfied that the evidence

8

demonstrates the reasonableness of the decision. No part of the evidence may be exclusively relied upon if it would be unreasonable to do so. The reviewing court needs to find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency.

*Id.* (citation omitted). Although we view the evidence in the light most favorable to the PRC's decision, we will uphold the decision only if it is supported by substantial evidence. *Id.* "Substantial evidence on the record as a whole is evidence demonstrating the reasonableness of an agency's decision, and we neither reweigh the evidence nor replace the fact finder's conclusions with our own." *DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 12, 146 N.M. 453, 212 P.3d 341 (citation omitted).

## IV. DISCUSSION

### A. Constitutional Claims

**{19}** The constitutionality of the PRC's rulings present this Court with a question of law, which we review de novo. *See Archuleta v. Santa Fe Police Dep't*, 2005-NMSC-006, ¶ 19, 137 N.M. 161, 108 P.3d 1019 (applying de novo standard of review to due process violations); *U S West Commc'ns, Inc. v. N.M. State Corp. Comm'n*, 1999-NMSC-016, ¶ 15, 127 N.M. 254, 980 P.2d 37 (holding that an agency's rulings with respect to whether a party was "afforded the process it is due under the Fourteenth Amendment to the United States Constitution are subject to de novo review"); *U S West Commc'ns, Inc. v. N.M. State Corp. Comm'n*, 116 N.M. 548, 549, 865 P.2d 1192, 1193 (1993) (applying independent judgment to claimed constitutional violation).

### 1. Whether Public Notice was Inadequate and Misleading

**{20}** ABCWUA and NMIEC claim that the public notice in the present case was inadequate and misleading, in violation of their right to procedural due process of law. Specifically, ABCWUA argues that "[t]he parties, who spent significant time and resources addressing the financial issue, were denied due process and unfairly prejudiced by the lack of notice that the [PRC] no longer considered the proceeding an emergency and viewed PNM's financial condition irrelevant." Additionally, NMIEC argues that the case "changed from an emergency, interim relief case into a routine rate application," and "due process required it to be re-noticed to reflect that change."

**{21}** "It is well settled that the fundamental requirements of due process in an administrative context are reasonable notice and opportunity to be heard and present any claim or defense." *Jones v. N.M. State Racing Comm'n*, 100 N.M. 434, 436, 671 P.2d 1145, 1147 (1983) (internal quotation marks and citation omitted). Notice "should be more than a mere gesture; it should be reasonably calculated, depending upon the practicalities and peculiarities of the case, to apprise interested parties of the pending action and afford them

an opportunity to present their case." *U S West Commc'ns, Inc.*, 1999-NMSC-016, ¶ 29 (internal quotation marks and citation omitted). General notice of the issues to be presented at a hearing is sufficient to comport with due process requirements. *Santa Fe Exploration Co. v. Oil Conservation Comm'n*, 114 N.M. 103, 111, 835 P.2d 819, 827 (1992).

**{22}** On March 29, 2008, the PRC published notice of the proceedings in the present case in the *Albuquerque Journal*. The notice reprinted in its entirety the PRC's March 25, 2008 Order Establishing Procedural Schedule and Opening New Docket. The notice stated that, on March 20, 2008, PNM had filed a joint motion asking the PRC to implement

> what [PNM] characteriz[es] as an Emergency FPPCAC, which, [PNM] contend[s], [addresses and takes] into consideration the suggestion of the [PRC's] Utility Division Staff ("Staff") in PNM's pending rate case in Case No. 07-00077-UT, and include[s] conditions that are designed to mitigate the impact on customer bills during peak periods and provide additional incentives to PNM management to control costs to the extent they are controllable. . . .
>
> . . . .
>
> In support of [its] request [PNM has] submitted the Affidavit of Charles N. Eldred, PNM's Executive Vice President and Chief Financial Officer with the Joint Motion. According to [PNM], Mr. Eldred's Affidavit demonstrates that PNM is experiencing serious cash flow problems, is at risk of losing its investment grade ratings and is experiencing a loss of overall financial integrity. . . .
>
> One of the primary reasons for PNM's weakened financial condition, Mr. Eldred contends, is the lack of appropriate recovery of rapidly escalating fuel and purchased power costs. . . .
>
> Mr. Eldred states that approving an FPPCAC would send a positive message to the financial community that the [PRC] is serious about properly balancing the interest of investors with those of ratepayers and, hopefully, quiet the concerns to some extent about PNM's financial condition. Without an FPPCAC, Mr. Eldred believes, it is "inevitable" that PNM's credit rating will be downgraded to junk bond status.

**{23}** "In light of the serious concerns raised by [PNM]" and "as a matter of protecting the public interest," the notice stated that the PRC had

> establish[ed] an expedited procedural schedule for the consideration and review of the Emergency FPPCAC. However, because the Emergency FPPCAC essentially is a new FPPCAC that is significantly different from the FPPCAC proposed by PNM in Case No. 07-00077-UT, and because the record in Case No. 07-00077-UT is now closed, the [PRC] finds the Joint

Motion should be considered in a separate docket. Accordingly, the [PRC] has opened a new docket, Case No. 08-00092-UT, and will move the Joint Motion into that case. All further pleadings and filing regarding the Joint Motion should be filed solely in Case No. 08-00092-UT. The [PRC] will, of course, take administrative notice of any evidence relevant to the Joint Motion and the Emergency FPPCAC that is in Case No. 07-00077-UT to the extent permitted by 17.1.2.37(D) NMAC. All other relevant evidence must be filed in Case No. 08-00092-UT.

**{24}** The foregoing notice properly informed the public of the arguments raised in PNM's application for an Emergency FPPCAC and the expedited procedural schedule established by the PRC. Contrary to the assertions of ABCWUA and NMIEC, nothing in the notice indicated that PNM's financial condition was relevant to the substantive issue of whether PNM is entitled to an Emergency FPPCAC on the merits under Section 62-8-7(E)(1) and Rule 550. Rather, the notice plainly stated that PNM's financial condition was relevant to the expedited procedural schedule adopted by the PRC. Specifically, the notice explains that, "[i]n light of the serious concerns raised" by PNM regarding an imminent financial crisis, the PRC had decided to "establish an expedited procedural schedule for consideration and review of the Emergency FPPCAC" to "[protect] the public interest." Accordingly, we conclude that the notice was neither inadequate nor misleading.

**{25}** Alternatively, NMIEC claims that the notice was constitutionally deficient because it "informed the public that the case involved a request for interim relief." We disagree. Nothing in the public notice indicated that the proceedings before the PRC pertained exclusively to interim relief under Section 1.2.2.27 of the Administrative Code. Indeed, if interim relief was the only issue before the PRC, then a public hearing would not have been required. *See* 1.2.2.27(D) NMAC ("[R]equests for interim relief other than interim rate relief may be acted upon with or without public hearing."). NMIEC appears to argue, however, that the notice was misleading because it referred to an "*Emergency* FPPCAC," which it believes is the same as an "*Interim* FPPCAC." We are not persuaded. The terms "emergency" and "interim" are not synonymous. The term "emergency" is defined as "[a] serious situation or occurrence that happens unexpectedly and demands immediate action," whereas the term "interim" is defined as "[a]n interval of time between one event, process, or period and another . . . temporary." The American Heritage Dictionary of the English Language 584, 913 (4th ed. 2000). Thus, an "Emergency FPPCAC" is an FPPCAC issued on an expedited procedural basis, whereas an "Interim FPPCAC" is a temporary FPPCAC, issued pending a final decision of the PRC. Because the PRC properly informed the public of the general issues to be decided, we conclude that the notice comported with due process requirements.

**{26}** Our conclusion on this point also disposes of NMIEC's claim that the PRC "ignored its own procedures and rules regarding interim rate relief." The PRC did not award interim rate relief to PNM and, therefore, the procedures delineated in Section 1.2.2.27 were inapplicable to the present case. *See* 1.2.2.27(A) ("Except as provided in Sections 65-2A-11

11

and 70-3-16 NMSA 1978, in addition to the usual contents of a pleading, the pleading must allege such extraordinary facts of immediate and irreparable injury as would justify the commission's exercise of discretion by granting interim relief prior to a final decision."). We therefore reject NMIEC's claim.

**2.      Whether the Expedited Procedural Schedule Deprived ABCWUA and NMIEC of Procedural Due Process of Law**

**{27}**      ABCWUA and NMIEC next argue that the expedited procedural schedule deprived them of procedural due process of law. Specifically, they claim that the PRC granted them an insufficient period of time in which to conduct "adequate discovery and to prepare and file the expert testimony needed to rebut PNM's application for an [E]mergency FPPCAC."

**{28}**      "In general, the right to due process in administrative proceedings contemplates only notice of the opposing party's claims and a *reasonable* opportunity to meet them." *Archuleta*, 2005-NMSC-006, ¶ 32 (internal quotation marks and citation omitted). Thus, "due process is flexible in nature and may adhere to such requisite procedural protections as the particular situation demands." *U S West Commc'ns, Inc.*, 1999-NMSC-016, ¶ 25 (internal quotation marks and citation omitted). A reviewing court's

> determination of what process is due in an administrative proceeding results from a balancing of (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Id.* ¶ 26 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In balancing these interests, we must "consider the proceedings as a whole." *Id.* (internal quotation marks and citation omitted).

**{29}**      PNM averred that it was facing an immediate and critical financial crisis due, at least in part, to "the lack of appropriate recovery of rapidly escalating fuel and purchased power costs." Indeed, PNM claimed that its financial condition was so severe that it was "experiencing difficulties in dealing with counterparties to procure power supplies and natural gas to serve customers." Thus, PNM's application for an Emergency FPPCAC implicated the substantial public interest in an efficient and uninterrupted supply of electric power and natural gas. *See* NMSA 1978, § 62-3-1(A)(1) (1967, prior to 2008 amendments) (recognizing that public utilities affect the public interest in that they render "essential public services to a large number of the general public").

**{30}**      However, this public interest must be balanced against ABCWUA's and NMIEC's private interest in just and reasonable utility rates. *See* § 62-3-1(B) (recognizing the private

12

interest in "reasonable and proper service" at "fair, just and reasonable rates"). Accordingly, we turn to the second prong of the *Matthews* test to determine "the probable value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 335.

**{31}** We conclude that additional extensions of time would have had little, if any, probative value in the present case. First, the record reflects that the parties had ample opportunity to present evidence regarding PNM's entitlement to an FPPCAC under Section 62-8-7(E)(1) and Rule 550 in the underlying rate case and that the PRC took administrative notice of this evidence. Second, the PRC granted ABCWUA and NMIEC two extensions of time, extending the time period in which they were required to file their responsive testimony from twelve to forty-two days. This was substantially longer than the three-day time period in which PNM was required to file its direct testimony, and only eighteen days shy of the sixty-day time period originally requested by ABCWUA and NMIEC in their Joint Motion for an Extension of Procedural Schedule. Under the present circumstances, we cannot conclude that the PRC's denial of a third extension of time was arbitrary, capricious, or unreasonable. *See Nat'l Council on Comp. Ins. v. N.M. State Corp. Comm'n*, 107 N.M. 278, 286, 756 P.2d 558, 586 (1988) ("The presumption . . . is that the [agency's] decision was reasonable.").

3.  **Whether the Absence of Commissioners King and Sloan from the Public Hearings Deprived ABCWUA of Procedural Due Process of Law**

**{32}** ABCWUA claims that it was deprived of its procedural due process right to a full and fair hearing because "Commissioners King and Sloan, who voted in favor [of the Emergency FPPCAC,] did not personally attend many of the proceedings and did not listen to the testimony telephonically." Additionally, ABCWUA questions whether Commissioners King and Sloan even "reviewed the record of the hearings they failed to attend prior to rendering their decision."

**{33}** The record reflects that the PRC conducted public hearings on PNM's application for an Emergency FPPCAC on May 12, 15, 16, and 17, 2008. Commissioner King did not attend the hearings held on the afternoon of May 12, 2008, the morning of May 16, 2008, or the morning or afternoon of May 17, 2008. Commissioner Sloan did not attend the hearings held on the morning of May 12, 2008, or the morning or afternoon of May 17, 2008. Despite their absence, both Commissioner King and Sloan voted in favor of the Final Order awarding PNM an Emergency FPPCAC.

**{34}** In the absence of a statutory provision to the contrary, neither due process nor the concept of a fair hearing requires "that the actual taking of testimony be before the same officers as are to determine the matter involved." E.H. Schopler, Annotation, *Administrative Decision by Officer Not Present When Evidence Was Taken*, 18 A.L.R. 2d 606, § 3 (1951). Rather, "the majority of cases hold that in order to comply with due process it is only required that members not present when testimony is taken review the testimony before participating in the decision." *Lewandoski v. Vermont State Colleges*, 457 A.2d 1384, 1387

13

(Vt. 1983); *see also Schmidt v. Beeson Plumbing & Heating, Inc.*, 869 P.2d 1170, 1179 (Alaska 1994) (holding that an administrative officer's attendance at evidentiary hearings is "not necessary" so long as the officer reviews the transcript and documentary evidence prior to rendering a decision); *Clairborne v. Coffeyville Mem'l Hosp.*, 510 P.2d 1200, 1202 (Kan. 1973) ("[A]n administrative decision is not invalid merely because, due to a change in personnel because of illness, death, resignation, transfers, or similar reasons, an officer who was not present when the evidence was taken, made or participated in the decision, provided he was considered and acts upon the evidence received in his absence.").

**{35}**    The burden is on ABCWUA to show that the Final Order is unreasonable or unlawful because Commissioners King and Sloan failed to review the evidentiary record prior to rendering a decision. *See* § 62-11-4. "[M]ere allegation that the commissioners did not consider the entire record [is] insufficient." *Pub. Utils. Comm'n v. District Court*, 431 P.2d 773, 777 (Colo. 1967) (en banc); *see also Nat'l Council on Comp. Ins.*, 107 N.M. at 286, 756 P.2d at 586 ("The presumption . . . is that the [agency's] decision was reasonable."); *Taub v. Pirnie*, 144 N.E.2d 3, 5 (N.Y. 1957) ("[I]n the absence of a 'clear' revelation that the administrative body 'made no independent appraisal and reached no independent conclusion', its decision will not be disturbed."). However, ABCWUA has failed to present this Court with any evidence to support its claim that Commissioners King and Sloan failed to review the evidentiary record prior to rendering a decision. Accordingly, we reject ABCWUA's due process claim.

**{36}**    Although we are not persuaded that a due process violation occurred, we nonetheless find the repeated absences of Commissioners King and Sloan, as well as Commissioner Ben R. Lujan, from the evidentiary hearings conducted by the PRC to be a cause for concern. The Commissioners of the PRC have a constitutional and statutory obligation to participate actively and fully in the proceedings before them. *See* N.M. Const. art. XI, § 1; § 8-8-4. Where the PRC does not delegate its authority to a hearing examiner, but, rather, conducts an evidentiary hearing before a full complement of Commissioners, unexplained absences should be the exception, rather than the rule.

4.      **Whether Commissioners King and Jones Improperly Failed to Recuse Themselves in Violation of the Due Process Clause**

**{37}**    NMIEC claims that Commissioners King and Jones "prejudged the outcome of the case prior to receiving all the evidence" and, therefore, improperly failed to recuse themselves in violation of NMIEC's procedural due process right to a fair and impartial hearing.

**{38}**    The following additional facts are relevant to NMIEC's claim. At a hearing conducted on April 24, 2008, Commissioner King proposed that PNM should be granted interim relief on its application for an Emergency FPPCAC. Commissioner Jones responded that, in lieu of interim relief, the PRC should render a final decision on PNM's application for an Emergency FPPCAC immediately following the conclusion of the public hearings.

14

Commissioner Jones explained that

> I just fear that we get in – here's what my concern is. We're really not giving them a decision [on their request for a FPPCAC in the rate case]. I think all of us understand that the possibility exists that we could be convinced that they need a fuel clause. That's about as easy a way to say I'm not convinced yet. If we go to a – if we go to May 15th [for the public hearings], take several days to render a decision and it's adverse and gets appealed, then I think that we've tied our hands into putting into any kind of an interim relief pending appeal. I could see this thing going on a year. I don't think – my opinion is . . . PNM doesn't have a year. I've seen enough stuff from Standard & Poors. These people have been in here begging, pleading and crying. There's no question in my mind PNM needs some relief here. How do we keep from killing a company if this goes through an appeal process and is there a way that in the event of an appeal that we can provide interim relief? That's my question. Because that's a question that I'm weighing right now is whether or not to give them an interim fuel clause.

**{39}** Commissioner Jones acknowledged that his alternate proposal might have "dilute[d]" or "muddied" Commissioner King's motion for interim relief and, therefore, he moved for consideration of Commissioner King's original motion. Commissioners King and Jones voted in favor of granting PNM interim relief. Commissioner King explained that

> We're not crying wolf. We have a very, very serious situation today. That's not going to gloss over. It's going to get worse in the days ahead if we don't take decisive action today. There's not any debate in my mind about that. I think we're going to see in the next few days when Moody comes forward, it's going to be worse still and so I think we need to take action.

However, the remaining Commissioners did not vote in favor of the motion and, consequently, interim relief was not granted.

**{40}** Thereafter, NMIEC filed a motion requesting Commissioners King and Jones to recuse themselves from the present case, claiming that they had "prejudged the outcome of this case in favor of [PNM] before the full evidentiary record [had] been developed." In support of its motion, NMIEC argued that the Commissioners's votes in favor of interim relief, as well as their accompanying statements, "clearly establish that [they] have already made up their minds about the emergency fuel clause."

**{41}** Commissioners King and Jones denied NMIEC's motion, explaining that they could and would "make a fair and impartial decision based on the record to be developed." They believed that

> NMIEC may have completely misunderstood Commissioner Jones'

15

comments during the April 24 meeting. Contrary to NMIEC's assertions, neither Commissioner Jones nor Commissioner King voted to approve, **on its merits,** the Emergency Fuel Clause proposed by PNM in this case.

Rather, we both supported granting PNM an *INTERIM* rate clause that would be in effect until a final decision were issued in this case on PNM's Emergency Fuel Clause. . . .

We supported giving PNM an interim fuel clause solely as a way to give PNM some interim relief until we and the rest of the [PRC] had the opportunity to determine, based on the record in this case, whether a more permanent fuel clause or some other relief should be given to PNM.

**{42}**    It is well established that adverse rulings do not constitute a valid basis for disqualification based on personal bias or prejudgment of a disputed factual issue. *See, e.g.*, *Liteky v. United States*, 510 U.S. 540, 541 (1994) ("[J]udicial rulings alone almost never constitute valid basis for a bias or partiality recusal motion."); *State v. Hernandez*, 115 N.M. 6, 20, 846 P.2d 312, 326 (1993) (holding that "[p]ersonal bias cannot be inferred from an adverse ruling"); *United Nuclear Corp. v. Gen. Atomic Co.*, 96 N.M. 155, 249, 629 P.2d 231, 325 (1980) ("Rulings adverse to a party do not necessarily evince a personal bias or prejudice on the part of the judge against it even if the rulings are later found to have been legally incorrect."). Accordingly, we reject NMIEC's claim that Commissioners King's and Jones's votes in favor of interim relief mandated their disqualification from all further proceedings.

**{43}**    Nonetheless, NMIEC claims that the Commissioners's comments during the April 24 hearing demonstrated that they "had already made up their minds" about the merits of the present case. We recognize that "comments by a Commissioner which constitute prejudgment may constitutionally taint any subsequent hearing so as to invalidate the ensuing order of the [PRC]." *Mountain States Tel. & Tel. Co. v. Corp. Comm'n*, 99 N.M. 1, 7, 653 P.2d 501, 507 (1982) (per curiam); *see also* NMSA 1978, § 8-8-18(A)(1) (1998) ("A commissioner or hearing examiner shall recuse himself in any adjudicatory proceeding in which he is unable to make a fair and impartial decision or in which there is reasonable doubt about whether he can make a fair and impartial decision, including . . . when he has . . . prejudged a disputed evidentiary fact involved in a proceeding prior to hearing."). However, "not all allegations of bias or prejudice are of the type that render a proceeding fundamentally unfair or require the disqualification of a decisionmaker." *U S West Commc'ns, Inc.*, 1999-NMSC-016, ¶ 41.

**{44}**    To determine whether a Commissioner's remarks constitute prejudgment sufficient to violate the constitutional right to due process of law,

[t]he inquiry is not whether the [commission]ers are actually biased or prejudiced, but whether, in the natural course of events, there is an indication of a possible temptation to an average [person] sitting as a judge to try the case with bias for or against any issue presented to him [or her]. This inquiry

16

measures allegations of bias or prejudice by an objective standard . . . .

*Id.* ¶ 42 (internal quotation marks and citation omitted).  In conducting this inquiry, we are mindful that

> [o]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of the trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Id.* ¶ 44 (quoting *Liteky*, 510 U.S. at 555).

**{45}**    The timing of Commissioners King's and Jones's remarks indicate that they were based on the evidence adduced in the rate case, as well the direct testimony filed by PNM in the present case.  Absent evidence to the contrary, we will not presume that these remarks "were based on information obtained . . . outside the course of the proceedings." *Id.*; *see also Siesta Hills Neighborhood Ass'n v. Albuquerque*, 1998-NMCA-028, ¶ 19, 124 N.M. 670, 954 P.2d 102 (upholding a city councilor's refusal to disqualify herself because the appellant had failed to produce any evidence indicating that the councilor prejudged the merits of the case).  Because these remarks do not "'display a deep-seated favoritism or antagonism that would make fair judgment impossible,'" *U S West Commc'ns, Inc.*, 1999-NMSC-016, ¶ 44 (quoting *Litkey*, 510 U.S. at 555), we conclude that Commissioners King and Jones properly declined to recuse themselves.

5.    **Whether the PRC's Failure to Defer to the Vote of the Dissenting Commissioners Violated the Equal Protection Clause**

**{46}**    ABCWUA claims that the PRC improperly failed to defer to the votes of the two dissenting Commissioners, "who represent a significantly greater number of PNM customers than the remaining three Commissioners," thereby depriving the "customers in those districts [of] adequate representation and equal protection of the laws" in violation of the Fourteenth Amendment to the Federal Constitution.

**{47}**    The PRC is composed of five Commissioners, each of whom is elected from a different district.  *See* NMSA 1978, § 8-7-2 (1997).  The boundaries of the five different districts are "established pursuant to the Precinct Boundary Adjustment Act [1-3-10 to 1-3-14 NMSA 1978] and revised and approved by the secretary of state as of August 31, 2001." NMSA 1978, § 8-7-5(A) (2001); *see* NMSA 1978, §§ 8-7-6 to -10 (2001) (codifying the boundaries of the five PRC districts).

> The purpose of the Precinct Boundary Adjustment Act [1-3-10 to 1-3-14

17

NMSA 1978] is to comply with the criteria established pursuant to the provisions of Subsection (c) of Section 141 of Title 13 of the United States Code in order to obtain an enumeration of the populations of election precincts by the bureau of the census in the federal decennial census and in order to provide such enumeration data to the New Mexico legislature for purposes of legislative reapportionment.

NMSA 1978, § 1-3-11 (1995). Pursuant to Section 8-8-4(D), only "a majority vote of the commission is needed for a final decision of the commission."

**{48}** Essentially, ABCWUA claims that Sections 8-7-6 through 8-7-10 violate the one person, one vote principle of the equal protection clause because the PRC districts are not equally apportioned on the basis of population. *Cf. Connor v. Finch*, 431 U.S. 407, 416 (1977) ("The Equal Protection Clause requires that legislative districts be of nearly equal population, so that each person's vote may be given equal weight in the election of representatives."). "In calculating the deviation among districts, the relevant inquiry is whether the vote of any citizen is approximately equal in weight to that of any other citizen, the aim being to provide fair and effective representation for all citizens." *Board of Estimate of City of New York v. Morris*, 489 U.S. 688, 701 (1989) (internal quotation marks and citations omitted); *id.* at 703 (holding that a population deviation of 78% violated the "one-person, one-vote ideal").

**{49}** The record is devoid of any evidence regarding the relative population density of each of the five PRC districts or the maximum deviation among the districts. The burden is on ABCWUA to provide this Court with an adequate record to review the merits of its claims on appeal. *See* § 62-11-4 ("The burden shall be on the party appealing to show that the order appealed from is unreasonable, or unlawful."); *see also Brown v. Trujillo*, 2004-NMCA-040, ¶ 34, 135 N.M. 365, 88 P.3d 881 (noting parenthetically that "the party seeking review has the burden of providing an adequate record to review the issues on appeal"). Because ABCWUA has failed to fulfill its burden, we will not review its equal protection claim.

**B.      Statutory and Regulatory Claims**

**{50}** The PRC's "decisions requiring expertise in highly technical areas, such as utility rate determinations, are accorded considerable deference. Less deference, however, is warranted when reviewing determinations outside the realm of the [PRC]'s expertise." *El Vadito de Los Cerillos Water Ass'n v. N.M. Pub. Serv. Comm'n*, 115 N.M. 784, 787, 858 P.2d 1263, 1266 (1993) (citation omitted). Statutory construction "is not a matter within the purview of the [PRC]'s expertise" and, therefore, "'we afford little, if any, deference to the [PRC] on this matter.'" *NMIEC*, 2007-NMSC-053, ¶ 19 (quoting *Pub. Serv. Co. of N.M. v. N.M. Pub. Util. Comm'n*, 1999-NMSC-040, ¶ 14, 128 N.M. 309, 992 P.2d 860). Accordingly, we apply a de novo standard of review to the PRC's rulings regarding statutory construction. *Id.*

**{51}** By contrast, "[t]his Court will generally defer to an agency's reasonable interpretation of its own ambiguous regulations," *In re Rhino Envtl. Servs.*, 2005-NMSC-024, ¶ 13, 138 N.M. 133, 117 P.3d 939, especially where the subject of the regulation implicates agency expertise, *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806. However, we are not bound by the agency's interpretation and we may substitute our own independent judgment for that of the agency "if the agency's interpretation . . . is unreasonable or unlawful." *Morningstar Water Users Ass'n*, 120 N.M. at 583, 904 P.2d at 32 (noting that "it is the function of the courts to interpret the law"). The canons of statutory construction guide our interpretation of administrative regulations. *Johnson v. N.M. Oil & Conservation Comm'n*, 1999-NMSC-021, ¶ 27, 127 N.M. 120, 978 P.2d 327.

**{52}** "When construing statutes, our guiding principle is to determine and give effect to legislative intent." *NMIEC*, 2007-NMSC-053, ¶ 20. "In discerning the Legislature's intent, we are aided by classic canons of statutory construction, and [w]e look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 9, 146 N.M. 24, 206 P.3d 135 (internal quotation marks and citation omitted). "Statutory language that is clear and unambiguous must be given effect." *V.P. Clarence Co. v. Colgate*, 115 N.M. 471, 473, 853 P.2d 722, 724 (1993). "Only if an ambiguity exists will we proceed further in our statutory construction analysis." *Marbob Energy Corp.*, 2009-NMSC-013, ¶ 9.

## 1. Whether the Emergency FPPCAC Violates Section 62-8-7(E)

**{53}** ABCWUA and NMIEC claim that the Emergency FPPCAC violates Section 62-8-7(E) because it fails to ensure "reasonable and proper service at fair, just and reasonable rates." Section 62-8-7(E). Specifically, ABCWUA and NMIEC argue that the Emergency FPPCAC unlawfully permits PNM "to pass on increased fuel and purchased power costs without an examination of the other areas in which its costs may have decreased or its revenues increased," thereby requiring consumers to pay increased costs while PNM enjoys increased profits.

**{54}** Section 62-8-7(E) plainly and unambiguously provides that "taxes or cost of fuel, gas or purchased power" may be recovered automatically via a FPPCAC. Section 62-8-7(E); *see also NMIEC*, 2007-NMSC-053, ¶ 31. "The purpose of a [FPPCAC] is to flow through to the users of electricity the increases or decreases in Applicable Fuel and Purchased Power costs per kilowatt-hour of delivered energy above or below a Base Cost." Rule 550.6(D). FPPCACs "provide for the stability of utility earnings when electric fuel costs and purchased power costs are rising and permit prompt credits to customers when electric fuel costs and purchased power costs are declining." Rule 550.6(B). Thus, utilities only "collect through the FPPCAC the amount actually expended for fuel and purchased power costs." Rule 550.6(C).

19

**{55}** Automatic cost recovery is "a narrow exception" to the general rule requiring "notice, hearing, and approval" in rate cases. *NMIEC*, 2007-NMSC-053, ¶ 31. In determining whether a FPPCAC is appropriate in a particular case, Section 62-8-7(E) requires the PRC to consider, inter alia, "whether the existence of a particular adjustment clause is consistent with the purposes of the Public Utility Act, including serving the goal of providing reasonable and proper service at fair, just and reasonable rates to all customer classes." *See also* § 62-3-1(B) ("It is the declared policy of the state that the public interest, the interest of consumers and the interest of investors require the regulation and supervision of such public utilities to the end that reasonable and proper services shall be available at fair, just and reasonable rates . . . .").

**{56}** FPPCACs, by their very nature, authorize the direct and automatic recovery of a utility's actual fuel, gas, and purchased power costs. Indeed, the purpose of a FPPCAC is to place the burden of volatile fuel costs on the consumer; thereby providing the public utility with a stable income stream, while at the same time ensuring that the consumer only pays for the fuel and purchased power costs actually incurred. *See* Rule 550.6(B)-(D). To require a utility to offset its fuel and purchased power costs against cost-savings in other areas would undermine the direct and automatic nature of the cost recovery system inherent in FPPCACs. By enacting Section 62-8-7(E), which explicitly permits FPPCACs, the Legislature plainly has determined that the benefits of such an efficient cost recovery system outweigh the possible burdens that it might impose on consumers and "is consistent with the purposes of the Public Utility Act, including serving the goal of providing reasonable and proper service at fair, just and reasonable rates to all customer classes."

**{57}** ABCWUA and NMIEC claim, however, that Section 62-8-7(E) must be construed narrowly to prohibit the cost-shifting mechanism inherent in a FPPCAC. In support of their claim they rely on *NMIEC*, in which this Court held that renewable energy certificates are not eligible for automatic cost recovery because Section 62-8-7(E) plainly and unambiguously limits allowable costs to "taxes or cost of fuel, gas or purchased power." *NMIEC*, 2007-NMSC-053, ¶ 31 (internal quotation marks and citation omitted). "In light of [this] plainly exclusive language, we interpret[ed] Section 62-8-7(E) narrowly and decline[d] to read into it language which is not there . . . ." *Id.* ¶ 33 (internal quotation marks and citation omitted).

**{58}** *NMIEC* did not hold, as ABCWUA and NMIEC suggest, that the entire statutory scheme governing FPPCACs is subject to narrow construction. Rather, it simply held that the statutory phrase "taxes or cost of fuel, gas or purchased power" must be construed narrowly, consistent with its plain and unambiguous language. *Id.* ¶¶ 31-33. Because the Emergency FPPCAC, in the present case, limits automatic cost recovery to "taxes or cost of fuel, gas or purchased power," we reject ABCWUA's and NMIEC's claim.

**{59}** However, ABCWUA claims in its reply brief that the Emergency FPPCAC violates Section 62-8-7(E) because it relies on forecasted increases in PNM's fuel and purchased power costs, rather than the historical test year method, whereby the PRC "evaluates a

utility's operating costs for a specified preceding twelve-month period and uses the utility's past experience as a guide to the utility's future revenue requirement." *In re PNM Gas Servs.*, 2000-NMSC-012, ¶ 6, 129 N.M. 1, 1 P.3d 383.  During the pendency of this appeal, the PRC filed a motion to strike ABCWUA's claim, arguing that it had not been raised in ABCWUA's brief-in-chief.  Our review of ABCWUA's brief-in-chief reveals that, although ABCWUA raised this argument in support of its procedural due process and substantial evidence claims,[4] it failed to raise the issue as a separate basis for reversal of the PRC's Final Order.  It is well established that we will not address issues "raised for the first time in the reply brief."  *State v. Fairweather*, 116 N.M. 456, 463, 863 P.2d 1077, 1084 (1993). Accordingly, the PRC's motion to strike is hereby granted.

## 2. Whether the Emergency FPPCAC Violates Section 62-8-6

**{60}** ABCWUA next claims that the Emergency FPPCAC violates Section 62-8-6 because it establishes and maintains "unreasonable differences as to rates of service."  Specifically, ABCWUA argues that the Emergency FPPCAC improperly discriminates against "efficient-use customers with high load factors and customers who consume [electricity during] off-peak" hours because it recovers fuel and purchased power costs through a uniform per kilowatt hour charge.

**{61}** Section 62-8-6 provides, in relevant part, that

> [n]o public utility shall, as to rates of services, make or grant any unreasonable preference or advantage to any corporation or person within any classification or subject [to] any corporation or person within any classification to any unreasonable prejudice or disadvantage.  No public utility shall establish and maintain any unreasonable differences as to rates of service either as between localities or as between classes of service.

"[This] section does not prohibit variations in rates, nor does it require 'equal service.' Rather, it prohibits 'unreasonable differences' in rates of service between localities. Section 62-8-6 thus forbids arbitrary variations in rates, while permitting variations due to differing costs of service to different areas." *Albuquerque v. N.M. Pub. Regulation Comm'n*, 115 NM. 521, 531, 854 P.2d 348, 358 (1993) ("Allowing municipalities to contract with utilities for service rates to their inhabitants does not, ipso facto, violate Section 62-8-6."); *see also*

---

[4]In its brief-in-chief, ABCWUA claims that it was deprived of procedural due process of law because the expedited procedural schedule did not permit sufficient time to explore the accuracy of PNM's projected increase in fuel and purchased power costs.  We have rejected this claim for the reasons explained *supra* part IV.A.2.  ABCWUA also claims that the Emergency FPPCAC is not supported by substantial evidence because it is based on projected, rather than historical, fuel costs.  We reject this claim for the reasons hereinafter explained *infra* part IV.B.6.b.

*Albuquerque v. N.M. Pub. Serv. Comm'n*, 2003-NMSC-028, ¶ 25, 134 N.M. 472, 79 P.3d 297 (holding, in relevant part, that a utility properly may apportion undergrounding costs to those "customers located within the jurisdiction requiring the undergrounding").

**{62}**    John D. Olmstead, Rates Manager for PNM, submitted testimony concerning the "customer impacts of PNM's Emergency FPPCAC."  Olmstead explained that a FPPCAC that implements different rates based on different customer classifications is an inappropriate method of rate recovery because

    1)    PNM's Emergency FPPCAC proposal specifically requests recovery of increases in fuel expenses above what was allowed in NMPRC Case 07-00077-UT.  The amount charged to customers for base fuel does not vary by rate class, and to vary the recovery of those additional expenses by class is not consistent with the rate design adopted in NMPRC Case 07-00077-UT or cost justified.

    2)    Having an FPPCAC that varies by rate class <u>will cause some customers to change rate classes</u> on the basis of the combined cost of their base rate bill plus their FPPCAC charge.  This results in a revenue shortfall to PNM that <u>cannot</u> be corrected under the true-up provision of the Emergency FPPCAC.  If a class-by-class FPPCAC were adopted by the [PRC], the amount of the shortfall from rate switching could exceed $0.5 million.

    3)    An FPPCAC that varies by rate class could result in some rates that exceed the $0.01 per kWh FPPCAC cap that PNM has proposed in this case to limit customer impacts.  This would not allow PNM to recover some FPPCAC costs even though they had been approved for recovery at a company level.  If a class-by-class FPPCAC were adopted by the [PRC], the amount of the shortfall due to cap limits could exceed $1.7 million.

When asked whether the Emergency FPPCAC fairly apportions cost recovery across different rate classes, Olmstead answered, "Yes.  Increased fuel costs are allocated on a per kWh basis in a manner entirely consistent with cost causation principles."

**{63}**    In addition to Olmstead's testimony, the record reflects that the PRC has a "long-standing policy . . . to require fuel and purchased power costs to be recovered on a uniform per kWh basis."  Indeed, "every FPPCAC in effect in New Mexico recovers those costs in that manner."  This long-standing policy is reflected in Rule 550, which provides that "[t]he Fuel and Purchased Power Cost Adjustment Factor shall be expressed in $ per kWh, and the resultant monthly charge or credit shall be shown on each customer's monthly bill."  Rule 550.16.

**{64}**    However, ABCWUA points out that John C. Tysseling, Ph.D., President of E3c, Inc. (d/b/a Energy, Economic and Environmental Consultants), testified that "a disproportionate

impact occurs on the larger customer rate classes" "when the proposed Emergency FPPCAC surcharge is applied on a per kWh basis." Specifically, Tysseling explained that

> [t]he larger customer rate classes (generally) have lower fixed cost rate elements (per kWh of usage) . . . than is the case in smaller customer classes. Thus, when these Emergency FPPCAC . . . revenues are recovered on a per kWh basis—without consideration of the class revenues that are otherwise recovered on a "fixed" basis (e.g., Customer Charges)—there is a significant distortion in the cost responsibilities between rate classes. This is a classic "rate design" issue. In fact, if the [PRC] were to adopt the "per kWh" proposal it would send dramatically *incorrect price signals* to the larger customer classes.

**{65}** Viewing the foregoing evidence in the light most favorable to the PRC's decision, we conclude that the Emergency FPPCAC is supported by substantial evidence. *See NMIEC*, 2007-NMSC-053, ¶ 24 ("We view the evidence in the light most favorable to the [PRC]'s decision and draw every inference in support of the [PRC]'s decision, but we will not uphold the decision if it is not supported by substantial evidence." (citation omitted)). Olmstead's testimony, the long-standing policy of the PRC, and the plain language of Rule 550, amply support the PRC's determination that a uniform per kilowatt hour charge is the most equitable and efficient method of cost recovery. Although conflicting evidence existed, it is well established that "evidence of two conflicting opinions in the record does not mean that the decision arrived at is unsupported by substantial evidence." *Attorney General of N.M. v. N.M. Pub. Serv. Comm'n*, 101 N.M. 549, 553, 685 P.2d 957, 961 (1984). Accordingly, we conclude that the Emergency FPPCAC does not violate Section 62-8-6.

### 3. Whether the FPPCAC Violates Section 62-8-8

**{66}** ABCWUA and NMIEC claim that the Emergency FPPCAC improperly permits PNM to treat the costs of the independent audit as a regulatory asset, which may be recovered from the ratepayers through PNM's base rates. Specifically, they claim that Section 62-8-8 already imposes an inspection and supervision fee on utilities, which may be recovered from the ratepayers through their base rates and, therefore, the Emergency FPPCAC forces ratepayers to pay twice for utility regulation.

**{67}** The following additional background is necessary for our review of this claim. In its Final Order, the PRC found that a prudency review of the Emergency FPPCAC was necessary "[i]n order to provide the parties and PNM customers assurances that PNM's electric power is generated and purchased at the lowest reasonable cost." However, the PRC had "neither the resources nor the expertise to conduct an adequate prudency review" of the Emergency FPPCAC. Consequently, the PRC held that the prudency review must "be conducted by an auditor or team of auditors to be selected by, and under the direction of, [the PRC]." The PRC ordered PNM to "pay for the costs of the prudency review," but permitted PNM to treat those costs "as a regulatory asset" that may be recovered "from its ratepayers

through the rates established in PNM's next general rate proceeding."

**{68}**    The PRC "has an obligation to allow a utility expenses that are necessary in providing utility service, that benefit ratepayers, and that are prudently incurred." *In re PNM Gas Servs.*, 2000-NMSC-012, ¶ 68 (internal quotation marks and citation omitted).  For example, federal taxes and the expenses associated with a rate case are all legitimate operating costs that a utility may recover from its ratepayers through its base rates.  *See id.* ("Because rate proceedings are a part of the normal course of business for a utility and because rate proceedings, by establishing just and reasonable rates, are conducted for the benefit of both ratepayers and shareholders, it is widely accepted that rate case expenses are one aspect of a utility's operating costs and are recoverable in a general rate proceeding."); *In re Zia Natural Gas Co.*, 2000-NMSC-011, ¶ 11, 128 N.M. 728, 998 P.2d 564 ("[A] regulatory body cannot arbitrarily disallow federal taxes that a company has paid or is obliged to pay, by assuming a tax savings under a capital structure which does not exist.").  Because the independent audit is necessary for the proper administration of the Emergency FPPCAC and is beneficial to consumers by ensuring that PNM's electric power is generated at the lowest reasonable cost, we conclude that the costs of the audit are a legitimate operating expense that PNM may recover from its ratepayers through its base rates.

**{69}**    However, ABCWUA and NMIEC claim that PNM's ratepayers will be required to pay twice for utility regulation under Section 62-8-8.  Section 62-8-8 imposes an "inspection and supervision fee" on "[e]ach utility doing business in this state and subject to the control and jurisdiction of the commission with respect to its rates or service regulations."  "[T]he inspection and supervision fees are in fact fees charged for the services of the Public Service Commission in supervising and inspecting these rural electric cooperatives." *United Waterworks, Inc. v. N.M. Pub. Util. Comm'n*, 2000-NMCA-057, ¶ 11, 129 N.M. 262, 5 P.3d 584 (quoting N.M. Att'y Gen. Op. 62-16 (1962)).  However, the amount of the fee is not based on the PRC's actual costs of operation, or on the amount of regulation that a utility receives, but, rather, on a percentage of the utility's "gross receipts from business transacted in New Mexico for the preceding calendar year."  Section 62-8-8 (providing that the amount of the fee is five hundred six thousandths percent of a utilities annual gross receipts).  Additionally, the fee is not paid directly to the PRC, but, rather, is deposited "directly into the State general fund," where it "may be appropriated by the Legislature as it sees fit." N.M. Att'y Gen. Op. 78-10 (1978); *cf.* NMSA 1978, § 63-7-21 (1957) ("All moneys collected under the provisions of Chapter 194, Laws of 1951 . . . , shall be deposited with the state treasurer and by him credited to the general fund.").

**{70}**    The inspection and supervision fee is an administrative fee intended to defray the PRC's costs of operation by levying a tax or tariff on the annual gross receipts of the utilities subject to the PRC's supervision and control.  The amount of the fee has nothing to do with a utility's cost of regulation, and the amount of money generated by the fee has nothing to do with the money allocated to the PRC by the Legislature.  Thus, the utility and supervision fee does not recover, either directly or indirectly, the PRC's costs of regulation.  Although ABCWUA's and NMIEC's claim may be rejected on this basis alone, we note that, in the

present case, the prudency review will be conducted by an independent auditor, rather than the PRC. As such, the costs of the prudency review will not be borne by the PRC or recovered by the State through the inspection and supervision fee. Accordingly, we conclude that the Emergency FPPCAC properly permits PNM to treat these costs as a regulatory asset that may be recovered from the ratepayers through PNM's base rates.

## 4. Whether the Independent Audit Lacks Sufficient Regulatory Oversight

**{71}** ABCWUA claims that the independent audit lacks sufficient regulatory oversight because the PRC failed to "specify any details, it did not indicate how the audit would be conducted to protect ratepayers, and it did not explain or describe the timing or mechanics of the audit process." Without sufficient regulatory oversight, ABCWUA argues that the Emergency FPPCAC violates Rule 550 because it fails to ensure that "the utility's fuel and purchased power policies and practices are designed to assure that electric power is generated and purchased at the lowest reasonable cost." Rule 550.17(A)(3).

**{72}** The following additional background is necessary to our resolution of this claim. After the issuance of the PRC's Final Order, the PRC submitted a seventy-seven page Request for Proposals (RFP) in Case No. 08-00330-UT. The purpose of the RFP was "to select a qualified [auditor] to provide professional auditing and prudence review services of PNM's fuel and purchased power costs, fuel clause filings and related documentation for the period of June 1, 2008 through May 31, 2009." The RFP summarized the scope of the audit as follows:

- All cost elements of PNM's fuel clause shall be audited and reviewed for accuracy and compliance by the [auditor] selected by the [PRC] to ensure that only appropriate costs are being recovered from retail ratepayers. PNM files Rule 550 Form 1 on a monthly basis along with a number of supporting schedules showing the fuel clause related expenses and the balancing account.

- Data shall be collected, organized and maintained so that future audits can be conducted by the [PRC] staff.

- Written reports and presentations shall be made to the [PRC] each quarter and at the end of the audit time period. Additional reports and presentations may be requested by the [PRC] or its designated agent or recommended by the [auditor].

- The [auditor] may be required to prepare and submit written testimony and to stand for cross examination on its work related to the audit and prudence review. As needed, the [auditor] is to be available as a witness, assist with the drafting of direct testimony, cross-examination questions, briefs and motions, and other regulatory

activities.

**{73}**  The RFP summarized the scope of the prudence review as follows:

- The major elements of the utility fuel clause shall be reviewed for prudence by an [auditor] selected by the [PRC] to ensure that reasonable and accurate costs are being recovered from retail ratepayers. The [auditor] should review PNM practices and policies, procedures and compliance with regulations on all major components of fuel costs included in the fuel clause.

- Data shall be collected, organized and maintained so that future prudence reviews can be conducted by the [PRC] staff.

- A status report should be made to the [PRC] each month outlining key activities and summarizing current prudence review findings. At the end of the review, a report summarizing the prudence review and areas of concern will be required.  Additional reports and presentations may be requested by the [PRC] or its designated agent or recommended by the [auditor].

- The [auditor] may be required to prepare and submit written testimony and to stand for cross examination on its work related to the audit and the prudence review.  As needed, the [auditor] is to be available as a witness, assist with the drafting of direct testimony, cross-examination questions, briefs and motions, and other regulatory activities.

**{74}**  As the foregoing record reflects, the independent audit is subject to extensive regulatory oversight in Case No. 08-00330-UT.  We therefore reject ABCWUA's claim that the Emergency FPPCAC violates Rule 550.

**{75}**  Nonetheless, ABCWUA argues, for the first time in its reply brief, that "waiting until after the emergency hearing and the Final Order to set forth the details of the audit significantly impaired the parties' ability to ensure that the audit will result in a meaningful review of PNM's policies and practices and that its electric power is generated and purchased at the lowest reasonable cost."  As previously explained, we will not address issues "raised for the first time in the reply brief." *Fairweather*, 116 N.M. at 463, 863 P.2d at 1084.  We therefore decline to review ABCWUA's claim.

**5.    Whether the Emergency FPPCAC Violates Section 62-8-7(B)**

**{76}**  ABCWUA claims that PNM improperly failed to file new schedules in violation of Section 62-8-7(B).  Section 62-8-7(B) provides that,

26

[u]nless the commission otherwise orders, no public utility shall make any change in any rate that has been duly established except after thirty days' notice to the commission, which notice shall plainly state the changes proposed to be made in the rates then in force and the time when the changed rates will go into effect and other information as the commission by rule requires. The utility shall also give notice of the proposed changes to other interested persons as the commission may direct. *All proposed changes shall be shown by filing new schedules that shall be kept open to public inspection.* The commission for good cause shown may allow changes in rates without requiring the thirty days' notice, under conditions that it may prescribe.

(Emphasis added.) The purpose of the statute is to provide both the PRC and the public with advance notice of any proposed rate changes before those changes go into effect.

{77}    In the present case, PNM notified the PRC of the changes proposed in the Emergency FPPCAC on March 20, 2008, the date on which it filed its joint motion for an Emergency FPPCAC. The public was notified of these changes on March 29, 2008, the date on which public notice was published in the *Albuquerque Journal*. The Emergency FPPCAC, as modified by the PRC's Final Order, went into effect on June 2, 2008, approximately sixty days later.

{78}    With respect to the filing of new schedules, the record reflects that PNM filed new schedules in the underlying rate case in accordance with Section 62-8-7(B). However, the proceedings in the present case were severed from the underlying rate case. PNM did not file another set of new schedules until after the issuance of the Final Order granting its request for an Emergency FPPCAC. Specifically, the Final Order required PNM to file new schedules for the "Emergency FPPCAC containing terms and conditions consistent with [the] Final Order[,] . . . no later than 5 days after the date this Final Order is issued." PNM timely filed new schedules on May 27, 2008, and the Emergency FPPCAC went into effect six days later, on June 2, 2008.

{79}    We conclude that PNM complied with the substantive requirements of Section 62-8-7(B). First, PNM gave the PRC and the public approximately sixty days notice of the rate changes proposed in the Emergency FPPCAC. Second, PNM filed new schedules in accordance with the Final Order before the Emergency FPPCAC went into effect. We therefore reject ABCWUA's claim that the Emergency FPPCAC violates Section 62-8-7(B).

### 6.    Whether the Emergency FPPCAC Violates Rule 550.17(A)(2)

{80}    ABCWUA and NMIEC next claim that the PRC improperly concluded that PNM's "cost of fuel and purchased power contains costs which periodically fluctuate and cannot be precisely determined in a rate case." Rule 550.17(A)(2). First, ABCWUA and NMIEC challenge the PRC's construction of Rule 550, claiming that the PRC improperly concluded that "Rule 550 does not require a showing that purchase power and fuel costs are 'volatile'"

27

and "improperly shifted the burden of proof from PNM . . . [to] Staff and Intervenors to show that PNM's fuel and purchased power costs could be precisely determined" in a rate case. Second, ABCWUA and NMIEC challenge the sufficiency of the evidence, claiming that the evidence was insufficient to establish that PNM's fuel and purchased power costs periodically fluctuate and cannot be precisely determined in a rate case.

### *a.* *Whether the PRC Improperly Construed Rule 550.17(A)(2)*

**{81}** We begin our analysis with the plain language of Rule 550, which provides that

> A. No utility shall have a FPPCAC included in its tariff unless it complies with the requirements of NMPSC Rule 550 [17.9.550 NMAC] in the design of its FPPCAC and tariff and files an application with the Commission requesting approval of its use of a FPPCAC. The utility shall submit testimony along with its initial tariff filing and application under NMPSC Rule 550 [17.9.550 NMAC] showing that all of the purposes stated in of [17.9.550.6 NMAC] are met by its tariff and that:
>
> . . . .
>
> (2) the cost of fuel and purchased power contains costs which periodically fluctuate and cannot be precisely determined in a rate case.

Rule 550.17(A)(2). The rule imposes a burden of proof on the utility to prove that (1) its "cost of fuel and purchased power contains costs which periodically fluctuate," and (2) these fluctuating costs "cannot be precisely determined in a rate case." *Id.*

**{82}** Because the phrase "periodically fluctuate" is not defined in Rule 550, we turn to the dictionary to ascertain its common and ordinary meaning. *Cf. State v. Nick R.*, 2009-NMSC-050, ¶ 18, 147 N.M. 182, 218 P.3d 868 (noting that when a "term is not defined separately in the statutes" the court "must consider the ordinary meaning most likely to have been in the minds of the enacting legislators"). The term "periodic" is defined as "[h]appening or appearing at regular intervals . . . Recurring or reappearing from time to time; intermittent." *The American Heritage Dictionary of the English Language* 1307 (4th ed. 2000). The term "fluctuate" is defined as "[t]o vary irregularly . . . To rise and fall in or as if in waves." *Id.* at 677. Thus, fuel and purchased power costs "periodically fluctuate" if they rise and fall irregularly from time to time. In light of the plain language of the rule, we conclude that the PRC properly determined that "Rule 550 does not require a showing that purchase power and fuel costs are 'volatile', or fluctuate more than some other cost of providing service."

**{83}** We next address ABCWUA's argument that the PRC improperly shifted the burden of proof to Staff and Intervenors to prove that PNM's fuel and purchased power costs can be precisely determined in a rate case. In its Final Order, the PRC held that PNM had

fulfilled its burden of proof, stating that it was "persuaded by PNM's arguments that its fuel and purchased power costs [could not] be precisely determined in a rate case." With respect to the contrary arguments raised by the opposing parties, the PRC noted that these arguments

> are undercut by [the opposing parties'] failure to in any way identify what those predictable future costs are and what methodology could be used to precisely determined those future costs in this or any other rate proceeding. Similarly, none of the parties advance any arguments or evidence showing whether and how the previous fluctuations in price shown by PNM could have been precisely, or even reasonably, determined in a rate case. The [PRC] further agrees with PNM's contention that any future projection of fuel and purchased power costs is made substantially more difficult by the fact that PNM's fuel and purchased power costs can and will be affected by load growth, changes in customer demand, and changes in off-system sales revenues.

(Citations omitted.) Thus, the PRC did not shift the burden of proof to the opposing parties; the PRC simply held that the opposing parties had failed to discredit or rebut PNM's evidence demonstrating that its fuel and purchased power costs periodically fluctuate and cannot be precisely determined in a rate case.

### b.      *Whether the Emergency FPPCAC is Supported by Substantial Evidence*

**{84}**      Lastly, ABCWUA and NMIEC claim that the evidence was insufficient to establish that PNM's fuel and purchased power costs periodically fluctuate and cannot be precisely determined in a rate case. In support of their claim, they point to evidence in the record indicating that (1) PNM had advance knowledge and/or the ability to predict future fuel and purchased power costs, (2) PNM's coal and nuclear fuel costs "are the subject of long-term contracts and relatively stable," and (3) "only a tiny portion of PNM's fuel costs are volatile and that [PNM's] total annual fuel cost could be reasonably estimated."

**{85}**      The following additional evidence, which was adduced in the underlying rate case and of which the PRC took administrative notice, is relevant to this claim. Hugh W. Smith, PNM's Senior Vice President of Energy Resources, offered direct testimony with respect to PNM's need for a FPPCAC. Smith explained that

> PNM has operated without a FPPCAC since 1994. In recent years, however, prices for all fuels - coal, nuclear and natural gas - have increased substantially and become more volatile. Increased volatility means that it is increasingly difficult to predict the future costs of fuel and purchased power for the purpose of establishing an appropriate fuel cost level in rates, one that will be reflective of the period when the approved rates will be in effect. A FPPCAC is the most effective way to match fuel costs with fuel revenues so that customers pay only for the actual fuel and purchased power costs

29

incurred by PNM. In short, the FPPCAC eliminates the difficult and controversial task of predicting the level of these costs years into the future. Equally difficult to predict for rate setting purposes is the amount of off-system sales that will be generated and credited to customers during the period that rates are in effect. The availability of such sales and the level of margins derived from them depends upon future market prices, plant availability, and customers needs, which can vary significantly from year to year. The use of a FPPCAC, through which off-system sales credits flow, assures that customers are credited with the appropriate level of off-system sales during the period that rates are in effect, no more and no less.

Finally, as discussed by Dr. Samuel Hadaway in his testimony, the financial markets perceive that any utility without a FPPCAC operates with greater risk compared to a utility that has a FPPCAC. Credit rating agencies and investors take that risk factor into account when determining a utility's credit rating and its cost of capital. Thus, a utility that does not have a FPPCAC is potentially at a competitive disadvantage in the financial markets.

**{86}** Jeffrey E. Sterba, Chairman, President and Chief Executive Officer of PNM Resources, Inc. and its principal subsidiary, PNM, also offered direct testimony with respect to PNM's need for a FPPCAC. Sterba explained that

> Gas will be an increasing percent of our fuel base. Purchased power agreements will likely have variable fuel costs based on natural gas prices. Replacement power prices are high and volatile due to national market prices for gas and coal. Gas price volatility is evidenced by 50% to 60% price swings. The current fixed base rate method of fuel cost recovery for PNM is based on historical prices and limited estimates of future prices. If the estimate is too low, the company cannot recover costs. PNM was unable to recover about $50 million in increased fuel and purchased power costs over the past two years due to the lack of a fuel clause. This is one of the factors adversely affecting our credit standing. Rating agencies and investors view the impact of replacement power expense on cash flows in the absence of a fuel clause as significant risk. Dr. Hadaway discusses this in further detail. The result of this perceived risk is a higher cost of capital that is ultimately passed on to customers. Under the current method, without a fuel clause, the only way the company's owners can be protected from high volatility is to project high prices in the base rate calculations and have it approved by the [PRC]. If the estimate is too high, however, the price risk shifts to the customers and they pay more than actual costs. The fixed method also fails to provide accurate price signals, which are important to encourage economic efficiency. Either way the fuel and purchase power prices move, higher or lower, someone absorbs the risk when a fixed base rate method is used. An adjustment clause fairly balances the risk and instead tracks costs accurately for customers and [PNM]. In sum, the existing regulatory model is no longer

30

viable for customers of PNM because of the changes in our supply portfolio, market prices, the energy environment and the need to encourage DSM and energy efficiency.

**{87}**  E. James Ferland, who succeeded Smith as Senior Vice President of Energy Resources for PNM, offered rebuttal testimony disputing that PNM's nuclear and coal costs "are usually obtained through long-term contracts so that future fuel prices are fairly predictable." Ferland testified that

> [w]hile it is true that nuclear fuel and coal are generally obtained through longer-term contracts, these contracts are not fixed-price contracts. Longer-term contracts are used to provide some security for fuel availability.
>
> For uranium, purchases for Palo Verde are layered in over time, from a diverse set of suppliers, to avoid the delivery and price risk of buying fuel all from one supplier. Longer-term contracts and PNM's uranium purchasing strategy ensure a reliable fuel supply, but they do not prevent nuclear costs from fluctuating.
>
> Likewise, PNM's coal supply contract is not a fixed price contract. San Juan obtains all its coal from a single source. There are two main cost components for PNM's San Juan coal contract: the capital investment element and the operating cost reimbursement, which is over 70 percent of the total coal cost. Operating costs are affected by labor costs, prices for construction materials like steel and concrete and unforeseen events like the changing coal mine safety standards. These operating costs are passed directly through to PNM. The long-term contract does not prevent the cost of coal for San Juan from fluctuating. Please see PNM Exhibit EJF-1R, which shows costs on a dollar per megawatthour basis, to remove fluctuations due to changes in load. As can be seen, coal costs, even on a dollar per megawatthour basis, fluctuate month-to-month and year-to-year, and cannot be precisely determined in a rate case.

**{88}**  Ferland also offered rebuttal testimony disputing the "relative[] stabil[ity]" of PNM's nuclear costs. Ferland explained that the spot market price of uranium oxide ($U_3O_8$) "[i]n the few years prior to 2004," was "relatively stable, with prices between approximately \$8 and \$17 per pound." However,

> [s]ince 2004, there have been swift, dramatic spikes in the price of uranium, with the market seeing a tenfold price increase over that time, before making a quick retreat. With the rising level of concern about fossil fuel emissions, there is a growing level of consensus that the nuclear power industry in the U.S. will soon begin to expand, leading to increased demand for uranium. The market is not sure that supply will meet demand. As a result, we have clearly entered a new era of fluctuating nuclear fuel costs.

31

**{89}** We conclude that the foregoing evidence amply supports the PRC's findings that PNM's fuel and purchased power costs periodically fluctuate and cannot be precisely determined in a rate case. Although conflicting evidence existed, the issue on appeal is not whether there was sufficient evidence to support a contrary result but, rather, whether the evidence supports the findings made by the PRC. *See DeWitt*, 2009-NMSC-032, ¶ 25. Indeed, "[t]he PRC's order is rejected only if conflicting evidence renders incredible the evidence in support of the decision." *Qwest Corp. v. N.M. Pub. Regulation Comm'n*, 2006-NMSC-042, ¶ 38, 140 N.M. 440, 143 P.3d 478 (internal quotation marks and citation omitted). Because the conflicting evidence fails to render incredible the evidence that supports the PRC's decision, we affirm the Final Order of the PRC.

## V.    CONCLUSION

**{90}** For the foregoing reasons, we conclude that the PRC properly granted PNM's request for an Emergency FPPCAC. We therefore affirm the Final Order of the PRC.

**{91}    IT IS SO ORDERED.**

_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**CHARLES W. DANIELS, Justice**

**RICHARD C. BOSSON, Justice (dissenting)**

**BOSSON, Justice (dissenting).**

**{92}** The PRC conducted an expedited hearing on PNM's emergency request for an automatic fuel adjustment clause. During four days of testimony before the Commission, sitting en banc, the record reflects the following lack of participation by individual commissioners. One of the commissioners personally attended none of the hearings, and only participated by teleconference for a day and a half. Another commissioner attended one hearing and was absent for all the rest. Another commissioner attended for two days only. Only two of the five commissioners—a mere 40% of the PRC—personally attended all four days worth of hearings.

**{93}** The PRC attempts to defend such a dismal performance by citing to its own regulations which permit commissioners to abstain from attendance when they appoint a hearing examiner to take testimony, receive evidence, and recommend a decision to the full Commission. The PRC may also appoint one of its own to "preside" over hearings. Fair enough. The nagging little detail with this argument, of course, is that the Commission did not appoint a hearing examiner or one of its own to preside, but elected to hear the proceedings itself, the full PRC sitting en banc. Simply put, the Commission shouldered the responsibility of hearing this case from beginning to end, and that responsibility starts with the simple task of showing up for work.

**{94}** The PRC parries with general legal principles that understandably excuse *occasional* and de minimus absences from commission or board proceedings, so long as members review the full record of proceedings before they vote on the matter at hand. In fact, as a general rule, boards and commissions enjoy a presumption to that effect. However, the desultory performance of these commissioners vastly exceeds the context from which these principles arise. No case cited to us involves absences on this grand of a scale. And we have no way of being assured that individual commissioners—the 60% who were absent from more than half of the hearings—actually did review a record of proceedings. Significantly, after four full days of hearings involving complex, technical matters, the commissioners voted a mere five days later—barely enough time, one would think, to prepare the full record, much less review it.

**{95}** This is important. Members of boards and commissions are allowed to review the record and compensate for the occasional absence precisely because the alternative—voting on matters not reviewed—would deny due process of law to participants and the public alike. Faced with at least the potential for a due process violation, the PRC should do more than rely on a naked presumption that they reviewed the record, especially in light of the bothersome evidence suggesting that commissioners did no such thing.

**{96}** The Commission's own Code of Conduct states the "irrefutable principle" that "a public office is a public trust." It further states that the Commission "needs the public's respect and confidence that its power will be used on behalf of the community as a whole." Respect must be earned; it does not flow automatically upon assumption of office. In the face of this record, I am compelled to wonder how we can indulge these commissioners in any presumption that implies the faithful performance of their duties.

**{97}** And, more importantly, that question permeates the remainder of this appeal. Recall that this fuel adjustment clause—now granted PNM for the first time in many years—came about in an expedited, emergency proceeding that necessarily truncated the normal deliberative process for considering such a weighty matter. PNM had just been through an exhaustive rate proceeding, in which the hearing examiner recommended *against* this very fuel adjustment clause or one very much like it. PRC staff and many other parties joined the opposition to *automatic* fuel adjustment, preferring instead that PNM prove its need in the ordinary course of a rate proceeding. The PRC had not yet ruled on the hearing examiner's

recommended decision, when PNM seemingly aborted the normal appeal process and filed the present emergency petition declaring the need for immediate relief due to an impending fiscal crisis.

{98}  The PRC scheduled a hearing a mere two months away—a fraction of the time typically required to consider such a complex questions.  Then, as the hearing drew near, PNM's fiscal emergency evaporated, yet the PRC kept to its emergency time-table and denied the protestants their requests for additional time and opportunity to prepare and analyze complex technical evidence.  The PRC then based its decision to grant the fuel adjustment clause less upon the petition for emergency relief and more upon evidence in the initial rate proceeding that was still being appealed.

{99}  As judges, we take comfort when duties are performed in an orderly, routine manner consistent with normal practice and procedure.  Under those circumstances, we rely on a presumption of regularity.  Conversely, however, when matters fall outside the norm, experience teaches us to exercise a healthy dose of caution and circumspection.  We are on notice of the need for further inquiry.  I am at that point with the PRC.

{100}  This Court is the only constitutionally empowered body that can review the final orders of the PRC.  As the majority rightly notes, we traditionally afford those decisions a high level of deference, affirming in all but the rarest circumstances.  We defer to the PRC because, at least theoretically, the commissioners are in a better position to decide these types of issues—having been elected for that purpose and having acquired special expertise in these matters.

{101}  I am not convinced, however, that we are meeting our constitutional obligation when we defer to a commission that reaches its decisions under circumstances such as these.  Let us not forget that PRC commissioners sit in a quasi-judicial capacity; they adjudicate complex, technical matters that go to the heart of the public interest of our state.  We would never tolerate *judicial* conduct like this; I see no reason to be more permissive of PRC commissioners.

{102}  I would reverse this decision and remand for the PRC to reconsider its decision to grant PNM an automatic fuel adjustment clause, a decision that could ultimately be borne out, but only after a full proceeding in the ordinary course giving these protestants and others a full and adequate opportunity to present their case in opposition.

-------

**RICHARD C. BOSSON, Justice**

**Topic Index for** *Albuquerque Bernalillo County Water Utility Authority v. New Mexico Public Regulation Commission* **and** *New Mexico Industrial Energy Consumers v. New Mexico Public Regulation Commission*, **No. 31,268/31,273**

| | |
|---|---|
| **AL** | **ADMINISTRATIVE LAW AND PROCEDURE** |
| AL-DU | Due Process |
| AL-EV | Evidence |
| AL-HR | Hearings |
| AL-NO | Notice |
| AL-RE | Record |
| AL-RU | Rules |
| AL-SC | Scope of Review |
| AL-SE | Sufficiency of Evidence |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| CT-EP | Equal Protection |
| | |
| **PU** | **PUBLIC UTILITIES AND COMMUNICATIONS** |
| PU-EL | Electric |
| PU-GS | Gas |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |