This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**LIVING CROSS AMBULANCE SERVICE, INC.,**

Appellant,

v.                                              **NO. S-1-SC-35590**

**NEW MEXICO PUBLIC REGULATION COMMISSION and AMERICAN MEDICAL RESPONSE AMBULANCE SERVICE, INC., d/b/a AMERICAN MEDICAL RESPONSE, EMERGICARE,**

Appellees.

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

Joseph E. Earnest
Tesuque, NM

for Appellant

Russell R. Fisk
Santa Fe, NM

for Appellee New Mexico Public Regulation Commission

Miller Stratvert P.A.
Jennifer Davis Hall
Stephen B. Waller
Albuquerque, NM

for Appellee American Medical Response Ambulance Service, Inc., d/b/a American Medical Response, Emergicare

**DECISION**

**CHÁVEZ, Justice.**

{1}     The New Mexico Public Regulation Commission (PRC) granted Appellee American Medical Response Ambulance Service, Inc., d/b/a American Medical Response, Emergicare (AMR) a permanent certificate to provide ambulance service in Valencia County under the provisions of the Motor Carrier Act, NMSA 1978, §§ 65-2A-1 to -41 (2003, as amended through 2013).  Valencia County is a rural county that has recently experienced population growth, with most of its population concentrated in Los Lunas.  Despite this recent growth, patients who live in Valencia County and require ambulance transportation to a hospital must be transported to Albuquerque, which can be a 20 to 35 mile trip that occupies an ambulance for two or more hours.

{2}     From 1987 until April 5, 2013, Appellant Living Cross Ambulance Service, Inc. (Living Cross) had been the sole and primary provider of ambulance services in Valencia County, with the exception of a brief period between 1999 and 2000 when Superior Ambulance Company (Superior) was granted authority to operate in Valencia County.  In December 2012, Living Cross reduced its fleet from three 24-hour ambulances and two 12-hour ambulances to three 24-hour ambulances and one

12-hour ambulance. Living Cross subsequently reduced its fleet to two 24-hour ambulances in April 2013 to coincide with a grant of temporary authority from the PRC allowing AMR to operate in Valencia County.

{3} After the administrative proceedings in this case, the hearing examiner concluded that Living Cross did not provide continuous and adequate service from 2011 through 2013, prior to AMR's entry into Valencia County, and Living Cross was not able to provide continuous and adequate service at the time of the proceeding. Section 65-2A-13(D)(1). The hearing examiner further concluded that Living Cross did not adequately show that it would be able to provide continuous and adequate service in the future if AMR's application were denied, and also found that Living Cross did not show that its prior financial difficulties were substantially impacted by the entry of AMR. *Id.*; § 65-2A-8(D). With respect to AMR, the hearing examiner concluded that (1) AMR was fit, willing, and able to provide ambulance services in Valencia County, § 65-2A-8(B)(1); (2) AMR was in compliance with relevant safety and financial responsibility requirements, § 65-2A-8(B)(2); and (3) granting AMR permanent authority to provide ambulance services would "meet an ongoing public demand or need and thereby serve a useful public purpose," § 65-2A-8(B)(3). The PRC adopted the hearing officer's findings and conclusions in full and

2

issued a certificate allowing AMR "to provide ambulance service from points and places in Valencia County to points and places in Valencia and Bernalillo Counties, New Mexico." Living Cross appealed the PRC's decision on numerous grounds. We conclude that Living Cross's arguments lack merit, and the PRC's decision in this case was not arbitrary, capricious, or an abuse of discretion. Accordingly, we affirm the PRC.

**DISCUSSION**

**1.     Standard of review**

{4}     We may only reverse the PRC's order if we determine that it is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 65-2A-35(C). "[W]e apply a de novo standard of review to the PRC's rulings regarding statutory construction." *Albuquerque Bernalillo Cty. Water Util. Auth. v. N.M. Pub. Regulation Comm'n*, 2010-NMSC-013, ¶ 50, 148 N.M. 21, 229 P.3d 494. "With respect to questions of fact, we look to the whole record to determine whether substantial evidence supports the [PRC's] decision." *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n*, 2007-NMSC-053, ¶ 24, 142 N.M. 533, 168 P.3d 105. Although we view the evidence in the light most favorable to the PRC's

decision, we uphold the decision only if it is supported by substantial evidence. *Id.* "Substantial evidence on the record as a whole is evidence demonstrating the reasonableness of an agency's decision, and we neither reweigh the evidence nor replace the fact finder's conclusions with our own." *Albuquerque Bernalillo Cty. Water Util. Auth.*, 2010-NMSC-013, ¶ 24 (internal quotation marks and citation omitted).

**2.     The PRC did not err by granting operating authority to AMR for non-emergency service without considering the need for such service**

{5}     Living Cross contends that the PRC should not have granted AMR the authority to provide non-emergency ambulance service because AMR did not introduce evidence supporting the need for such service, a showing which Living Cross claims is required by the Motor Carrier Act. Under the Motor Carrier Act, an applicant seeking authority to provide ambulance service has "the burden of proving that the ambulance service that currently exists in the territory sought in the application is inadequate and that the proposed service is directly responsive to a public need and demand for the service proposed." Section 65-2A-13(C)(1). The PRC shall not grant an application

> for a certificate or permit for ambulance service, or for amendment, lease or transfer of such a certificate or permit, if it finds after hearing that the existing ambulance service is provided on a reasonably

4

continuous and adequate basis in the territory in which the new service is sought or that the holder of the certificate or lessee providing the existing ambulance service in such territory is willing and able to provide, and does subsequently provide, reasonably continuous and adequate service within such territory, as specified by commission order.

Section 65-2A-13(D)(1). "[A]mbulance service" is "the intrastate transportation of sick or injured persons in an ambulance meeting the standards established by the [PRC]." Section 65-2A-3(B). The Motor Carrier Act does not make any distinction between emergency and non-emergency services.

{6} Despite the plain language of the Motor Carrier Act, Living Cross contends that the PRC has in the past granted authority only for non-emergency ambulance service, and therefore there is precedent for the practice. Living Cross is correct that the PRC previously granted an applicant under severe financial stress permission to provide only non-emergency ambulance service. *See Bernalillo Cty. Health Care Corp. v. N.M. Pub. Regulation Comm'n*, 2014-NMSC-008, ¶ 5, 319 P.3d 1284. Although we vacated the PRC's order because it was arbitrary and capricious, we found substantial evidence to support the PRC's determination in that case that there was a public need for additional non-emergency ambulance services only. *Id.* ¶¶ 27-28.

{7} However, our approval of the PRC's exercise of its discretion in one case

5

involving financial hardship does not require the PRC to reach an identical result in all such cases. In this case, AMR applied for a certificate to provide ambulance services. The question was whether AMR met its burden of proving that the ambulance service provided by Living Cross is inadequate and that AMR's proposed service is directly responsive to a public need and demand. Section 65-2A-13(C)(1) & (D)(1). The hearing examiner found that "[N]o party presented evidence indicating that there [was] not a need for non-emergency service or that the certificate should be narrowed for any other reason to emergency service," and therefore recommended that the PRC issue a certificate to AMR for "ambulance service." By contrast, in *Bernalillo County Health Care*, the applicants provided 39 affidavits and other testimony to specifically support the need for non-emergency services. 2014-NMSC-008, ¶ 27. Because there was no specific showing in this case that it was necessary to conduct distinct analyses of emergency and non-emergency services, and because the Motor Carrier Act does not require the PRC to conduct such analyses in every case, the PRC did not err by not distinguishing between emergency and non-emergency services in considering the public need for ambulance services in this case.

{8} Additionally, we note that the PRC did not abuse its discretion in determining

6

that there was a public need for additional ambulance services in Valencia County. Indeed, admissions by Living Cross representatives alone suffice to support the PRC's conclusion that the ambulance service provided by Living Cross was inadequate. Justin Wood, Living Cross's operations manager, testified that Living Cross voluntarily reduced the number of ambulances it ran from the equivalent of four 24-hour ambulances to three and a half 24-hour ambulances in December 2012, and eventually to only two 24-hour ambulances, when AMR was granted temporary authority to operate in Valencia County in April 2013. Wood stated that the 2012 decision to reduce the number of Living Cross's operating ambulances was made despite his requests during the previous summer and the longstanding requests of numerous local emergency medical services agencies that Living Cross *add* ambulances to its fleet. For example, former Fire Chief Atilano Chavez of the Village of Los Lunas Fire Department testified that he attempted to address the shortfall of ambulances because whenever Living Cross fell short, the department's emergency medical technicians (EMTs) had to transport patients, which they did at a cost to the municipality and without an operating license from the PRC. When a 911 call is placed, the Valencia County Fire Department and a transporting ambulance service both go out. The fire department is intended to be a first responder to mitigate any

7

potential life-threatening hazards, after which the fire department hands the person off to the transporting ambulance service. However, when Living Cross does not arrive, the fire department requests mutual aid from surrounding ambulance carriers such as Isleta Pueblo, Albuquerque Ambulance, or Superior. If mutual aid is not forthcoming, and it often is not, the fire department asks for an estimated time of arrival from Living Cross and begins to transport the patient, sometimes with volunteer firemen performing the jobs of EMT transporters. The fire department will either rendezvous with Living Cross at the side of the freeway or elsewhere, which typically delays the transport process by 5 to 20 minutes, or it must take the patient all the way to Albuquerque, a task for which the department does not have either adequate authority or resources. In 2011, the department recorded at least 18 instances where it had to initiate medical transport. The number grew to at least 50 in 2012 and at least 15 in the three months prior to AMR's temporary grant of authority in 2013. Indeed, the Los Lunas Fire Department had so many issues with Living Cross's service that it took it upon itself to create a "Living Cross Ambulance Response Complaint Form" to keep track of delays and no shows by Living Cross. The record before the PRC included 33 separate complaint forms that were filed by fire department employees between July 2012 and February 2013. After numerous

complaints, Living Cross's attorney eventually told Fire Chief Chavez to stop calling Living Cross about his concerns.

{9}     David Bris, president and director of Living Cross, also admitted that Living Cross was aware of complaints about its service and did not attempt to address them. Bris testified that he met with representatives of local fire departments, who requested that Living Cross deploy additional ambulances, and that Living Cross managerial employees met internally to discuss the complaints. Yet Living Cross actually reduced its ambulance fleet during that time, despite having seven additional ambulances at its disposal. Bris admitted that five or six ambulances might be needed to meet the public need for ambulance services in Valencia County. Sam Ortega, the administrator for Living Cross, similarly testified that four to five ambulances are needed and that three and a half 24-hour ambulances would not always meet demand. The evidence in this case overwhelmingly supports a finding of a public need for both emergency and non-emergency ambulance services because of the inadequate service provided by Living Cross.

**3.     Living Cross was not deprived of due process as a result of the lack of established rules, standards, policies or procedures for determining missed call rates**

{10}     Living Cross observes that the PRC has not adopted any rules or regulations

9

setting forth a uniform standard for continuous and adequate ambulance service response times, as it has done for certain other passenger transportation industries. Living Cross contends that the PRC's lack of specific uniform rules regarding response times allows the PRC to arbitrarily decide the merits of applications for ambulance services contrary to both the Motor Carrier Act and the Ambulance Standards Act, NMSA 1978, §§ 65-6-1 to -6 (1974, as amended through 1998). Living Cross also argues that it is deprived of its due process rights if the PRC fails to provide notice as to when it is necessary and appropriate for a service provider to spend more money or apply for increased tariff rates in order to keep dropped call rates to the level that the PRC may consider to be appropriate. We review constitutional issues of law, including due process claims, de novo. *TW Telecom of N.M., L.L.C. v. N.M. Pub. Regulation Comm'n*, 2011-NMSC-029, ¶ 15, 150 N.M. 12, 256 P.3d 24.

{11} The Motor Carrier Act does not require uniform standards for response times or dropped calls. As previously discussed under the Motor Carrier Act, AMR was required to prove that the existing ambulance service provided by Living Cross was "inadequate" and that AMR's proposed service would be "directly responsive to a public need and demand" for the service. Section 65-2A-13(C)(1). The Motor

Carrier Act does not define what constitutes "public need and demand" or what renders a service "inadequate," nor does it give the PRC standards for evaluating either of these terms. However, the Motor Carrier Act does state that the " 'ability to provide certificated service' means that an applicant or carrier can provide reasonably continuous and adequate transportation service." Section 65-2A-3(A). The term "continuous and adequate service" is further defined as

> for full-service carriers, reasonably continuous availability, offering and provision of transportation services through motor vehicles, equipment and resources satisfying safety and financial responsibility requirements under the Motor Carrier Act and commission rule, which are reasonably adequate to serve the entire full-service territory authorized in the certificate, with *reasonable response to all requests for service for the nature of passenger service authorized, based on the nature of public need, expense and volume of demand for the type of service authorized during seasonal periods.*

Section 65-2A-3(M)(1) (emphasis added). It is fair, then, to conclude that the reasonableness of Living Cross's response times was a factor to be assessed in determining whether its service was inadequate. To the extent that it has included responsiveness in this assessment, the plain language of the Motor Carrier Act supports only the inference that responsiveness should be analyzed on a case-by-case basis. Thus, the Legislature has chosen not to micromanage or specifically define every term in the Motor Carrier Act, but instead has delegated authority to the PRC

11

to assess these factors and weigh the reasonableness of a carrier's response to requests for service according to the unique circumstances of each case. In fact, a uniform response time standard might actually be contrary to the discretionary approach that the Motor Carrier Act appears to endorse.

{12}     The Ambulance Standards Act also does not require the PRC to establish standards for dropped calls or response times. Instead, the Ambulance Standards Act requires the PRC to adopt regulations establishing uniform standards for vehicle design, health and safety equipment used in ambulances, procedures for operating ambulances, annual safety inspections, and licensing ambulance personnel. *See* § 65-6-4 (establishing the legislative purposes of the Ambulance Standards Act). Because the responsiveness of an ambulance service provider is outside of the ambit of the Ambulance Standards Act, it does not impose any requirement to establish uniform standards for adequate ambulance service, as Living Cross claims.

{13}     There are sound reasons for the PRC to avoid adopting a uniform responsiveness standard. For example, acceptable standards of responsiveness may differ substantially in more rural areas versus suburban or urban areas, and can depend on weather conditions or the size of the territory served. *See* 18.3.14.10(I) NMAC (listing "factors that can cause delays in meeting anticipated response times"

12

such as "(1) the geography of the territory; (2) whether the service uses volunteer or paid drivers; (3) whether the territory is urban or rural or both; (4) stationing points for ambulances and crews; [and] (5) weather"). Indeed, witnesses for AMR, Superior, and Living Cross acknowledged during the PRC proceedings that they are not aware of any uniform national, state, local, or industry standards for ambulance response times or missed calls, and the parties have not cited to any such standards in the briefing before this Court.

{14} Likewise, Living Cross has not presented a persuasive argument that the lack of uniform standards for ambulance response times presents a constitutional due process problem. Living Cross claims that the lack of a uniform response time standard "fails to give adequate notice to the carrier as to what level [of response time] is expected." However, as discussed above, the Motor Carrier Act provides a sufficiently definite standard by requiring that response times, among other factors, be "reasonable" and must provide both parties with an opportunity to present evidence as to reasonableness, which Living Cross did in this case. Sections 65-2A-3(M)(1); 65-2A-13(C). Thus, the statutory scheme followed by the PRC provides adequate due process. *See TW Telecom of N.M.*, 2011-NMSC-029, ¶ 17 ("[F]undamental requirements of due process in an administrative context are

13

reasonable notice and *opportunity to be heard and present any claim or defense.*" (emphasis in original) (internal quotation marks and citations omitted)).

{15}     We agree with the hearing examiner that proof of a public need, the failure of the existing carrier to provide reasonably continuous and adequate service, and proof of the existing carrier's inability to cure or provide continuous and adequate service in the future are sufficient standards by which the PRC could grant a certificate to operate ambulance service on a case-by-case basis.  Moreover, a prior PRC case cited by Living Cross where a 1 percent 911-emergency zero-status dispatch unavailability in Bernalillo County was one of several factors considered in the PRC's finding that there was insufficient evidence to justify a new emergency ambulance carrier, and was not dispositive to the PRC's consideration of call response time or its weighing of individual factors in this case.

**4.     The PRC did not err by considering Living Cross's financial stability when assessing whether Living Cross was providing continuous and adequate service**

{16}     Living Cross filed a motion in limine before the hearing examiner seeking to exclude evidence related to its financial fitness, tax conditions, and economic status, and claiming that those factors were not relevant to assessing its fitness to provide ambulance services.  The hearing examiner found that Living Cross's financial debts

14

and unpaid tax bills were relevant to several issues concerning the burdens of proof borne by both AMR and Living Cross. *See* 1.2.2.35(A) NMAC (setting forth the rule that in administrative proceedings, all relevant evidence is generally admissible and that the presiding officer shall consider, but not be bound by, the New Mexico rules of evidence).

{17}     Living Cross asserts that it was error for the PRC to consider this evidence because in 2013 the Legislature amended the Motor Carrier Act to prohibit the PRC from considering a carrier's financial fitness in recognition of the financial vulnerability of small businesses in a traditionally thin market transportation industry. We disagree. The policy behind the Motor Carrier Act is "to foster the development, coordination and preservation of a safe, sound and adequate motor carrier system, requiring financial responsibility and accountability on the part of motor carriers through state licensing and regulation of motor carriers." Section 65-2A-2. In addition, Section 65-2A-13(C)(2) imposes the burden on the protesting carrier—in this case, Living Cross—to demonstrate "with reasonable specificity . . . the . . . economic analysis related to expenses and revenues of the full-service operation and the anticipated economic, business or functional effect of the proposed service on the existing provision of, or rates for, full-service transportation within the full-service

territory." The PRC was also required to consider whether AMR's entry into the Valencia County market would cause financial harm to Living Cross. *See* § 65-2A-13(C)(2) & (D)(1). Therefore, Living Cross's financial condition prior to and following the temporary grant of authority to AMR in April 2013 was relevant.

{18} Living Cross's financial condition was alarming. Living Cross had incurred large debts, outstanding federal and state tax bills, improper loans to Bris, loans from Bris's family to Living Cross with high interest rates, lease agreements designed to mask compensation, and systemic financial problems that began years before AMR filed its application. Bris testified in a deposition that Living Cross owed about $1,000,000 in federal taxes that had been delinquent since the 1990s. As of April 1, 2013, Living Cross still owed $532,948.78 to the IRS as evidenced by an installment agreement. Living Cross also owed $811,544.72 in New Mexico state taxes as of November 6, 2006. As a result, the New Mexico Taxation and Revenue Department filed an application for injunction from engaging in business, and thereafter Living Cross entered into an installment agreement to pay back the taxes to avoid being put out of business. As of September 3, 2014, Living Cross still owed $75,196.09 to the State of New Mexico. Further, at least two loans from Bris's mother to Living Cross carried a 25 percent annual interest rate. One lease agreement required Living Cross

to pay David Bris $3100 per month to lease space identified as his residence and was signed by David Bris, lessor, and David Bris, lessee for Living Cross—a troubling arrangement.

{19}     Living Cross took out other questionable loans prior to AMR's application. For example, Living Cross entered into a promissory note in 1994 with J. Edward Hollington & Associates, amended the note 17 times, and modified it 14 times. As of October 5, 2012, Living Cross owed $146,052.20 on the note and was borrowing an additional $60,000 from the lender. There are other examples of indebtedness in the record that we do not need to detail. Suffice it to say that Living Cross's balance sheets as of December 31, 2013 showed total assets of $228,457.58 and total liabilities of $1,906,990.69.

{20}     It was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for the hearing examiner to admit this evidence and then rely on it in determining the merits of this case. Section 65-2A-35(C) (detailing the circumstances under which this Court may reverse a PRC order pursuant to the Motor Carrier Act). It was reasonable to conclude that the evidence of Living Cross's financial distress was relevant to whether (1) AMR's proposed entry into Valencia County was directly responsive to a public need and demand for the service proposed;

(2) Living Cross's existing ambulance service in Valencia County was provided on a reasonably continuous and adequate basis; (3) Living Cross, the current operator, was willing and able to provide, and did subsequently provide, reasonably continuous and adequate service within Valencia County; and (4) AMR's entry into the market would have a financial impact on Living Cross. There is substantial evidence that Living Cross was operating in severely distressed financial conditions long before AMR entered the market. This evidence supports the PRC's conclusions.

**5.      The PRC did not err by refusing to allow Living Cross to implement lease agreements with another provider as an alternative to granting AMR's application**

{21}      Living Cross asserts that even if it failed to meet a standard of continuous and adequate service in the past, it is entitled to remedy the situation by entering into lease agreements with other private companies under the provisions of Sections 65-2A-13(D)(1) and 65-2A-24(A) rather than the PRC authorizing AMR to operate in Valencia County. Under Section 65-2A-13(D)(1), the PRC should not have granted AMR's application in this case if it found that Living Cross provided ambulance service "on a reasonably continuous and adequate basis" in Valencia County, or if it found that Living Cross "is willing and able to provide, and does subsequently provide, reasonably continuous and adequate service within [Valencia County]."

18

However, there was ample justification in this case for the PRC's conclusion that the proposed lease agreements were insufficient to prove that Living Cross could provide continuous and adequate service or would be able to do so in the future.

{22} Living Cross proposed to enter into one of two alternative lease agreements with Superior; the first would be a lease for personnel and equipment, and the second would be a personnel-only lease. The personnel and equipment lease requires Superior to lease both ambulances and crews to Living Cross on an as-needed basis, 24 hours per day, for emergency ambulance calls within Valencia County. Living Cross and Superior represented that Superior would dedicate two units to the lease and additional units would be provided as needed during peak periods. Living Cross would have full control and responsibility for the deployment and operation of the leased units. Similarly, under the personnel-only lease, Superior would make available to Living Cross two paramedic and EMT teams 24 hours per day. Living Cross represented that it presently had sufficient ambulances and equipment to run five ambulances, and it would be able to immediately provide five ambulances in Valencia County with leased personnel from Superior. Living Cross also stated that leased personnel would be under its control and it would be solely responsible for their actions.

19

{23}   It was reasonable for the hearing examiner to conclude that these lease agreements do not show that Living Cross would be able to provide continuous and adequate service.[1] Paragraph 3 of the proposed personnel and equipment lease states in pertinent part that

> Superior shall give a request for deployment of a staffed ambulance unit and under this Agreement for response to a call for emergency ambulance service in Valencia County pursuant to this Agreement priority over its non-emergency and inter-facility carriage in Bernalillo County, *but shall have full discretion of whether to dispatch equipment and/or personnel as set forth below, to the extent that its units may be involved in, or anticipated to be required in, emergency ambulance transport within Bernalillo County.*

(Emphasis added.)   As Bris conceded, this provision means that Superior is not necessarily required to respond and assist Living Cross when such assistance is requested. Under paragraph 13 of the personnel and equipment lease, the agreement may be terminated by either party with 30 days' written notice at any time, with or without cause. In light of these facts, the PRC did not abuse its discretion in concluding that there was simply no assurance that the proposed personnel and equipment lease would provide the necessary services to Valencia County, or even

---

[1]On November 18, 2016, Living Cross filed a notice of subsequent change in authority with recently-enacted regulations regarding motor vehicle leasing attached. We have considered the notice, and conclude that it is not relevant to our analysis in this case.

continue for more than one month at a time.

{24}     The PRC's misgivings regarding the proposed personnel-only lease were also reasonable. That agreement can be terminated by either party for any reason with six months' written notice. The hearing examiner reasonably concluded that termination of the personnel-only lease upon six months' notice, much like the 30-day notice provision of the personnel and equipment lease, would not provide a sufficient opportunity for the PRC to certify another carrier to provide ambulance service in Valencia County.

{25}     The hearing examiner also reasonably concluded that Living Cross did not sufficiently establish how either lease agreement would help restore its tenuous financial condition. For example, Superior would bill for and retain 100 percent of the revenues for the services that its leased equipment and employees provided under the personnel and equipment lease, which means that Living Cross would not gain any revenue or cash flow from those services. Under the personnel-only lease, Superior would retain 80 percent of the revenues. Even though Living Cross would retain 20 percent of the revenues under the personnel-only lease, it would bear all of the fuel costs and other expenses associated with the ambulance units and equipment. Although Living Cross argued that the lease agreements would allow it to slowly

21

build up its fleet over time, the hearing examiner's skepticism regarding these vague plans for financial recovery was reasonable, given Living Cross's inability to operate profitably with a larger fleet long before AMR's application to operate in Valencia County.

{26} The hearing examiner reasonably concluded that based on Living Cross's history of failing to deploy an adequate number of ambulances and the uncertainty created by both leases and the lack of any definite business plan, Living Cross had not demonstrated an ability to return to reasonably continuous and adequate ambulance service in Valencia County in the near future. For the reasons discussed, this conclusion was supported by substantial evidence and was not arbitrary.

**6.      The PRC did not err by failing to adequately consider the financial impact to Living Cross of authorizing AMR to operate in Valencia County**

{27} Living Cross argues that the economic harm it would suffer due to AMR's entry into Valencia County alone was a sufficient ground to deny AMR's application, and therefore the PRC did not properly consider the effect of AMR's application on the existing ambulance service. Section 64-2A-8(D) provides that "[b]efore granting a certificate for ambulance service, the [PRC] shall also consider the effect that issuance of the certificate would have on existing ambulance service in the territory." When read in conjunction with Section 65-2A-13(D)(3), it is clear that the diversion

22

of revenue from an existing carrier is only one factor to be considered in determining the effect on existing ambulance service. Section 65-2A-13(D)(3) provides, in relevant part:

> In considering the potential effect on provision of transportation services to the public . . . the [PRC] shall consider all evidence presented pertaining to such potential effect, including evidence of the effect that diversion of revenue or traffic may have on the provision of full-service passenger service to the community. Diversion of revenue or traffic from an existing motor carrier shall not, however, be sufficient grounds for denying the application without a showing that the diversion presents a reasonable potential to affect the provision of full-service passenger service to the community.

{28} In compliance with the Motor Carrier Act, the PRC considered the financial impact on Living Cross in assessing AMR's application. The hearing examiner found that the impact on Living Cross from authorizing an additional carrier could be determined more definitively in this case because AMR was already operating in Valencia County pursuant to the authority granted in NMPRC Docket No. 13-00079-TR-M[2] and under the temporary authority the PRC granted to AMR in this case. The hearing examiner recognized that Living Cross's transport revenues declined when AMR serviced many of the calls that Living Cross previously would have serviced.

---

[2]The PRC previously granted a certificate to AMR that this Court vacated as the result of an attorney's conflict of interest. *Living Cross Ambulance Serv., Inc. v. N.M. Pub. Regulation Comm'n*, 2014-NMSC-036, ¶ 23, 338 P.3d 1258.

However, Living Cross's expenses also declined, and Living Cross actually made a profit through October 31, 2014. By contrast, in 2012, the year before AMR applied for authority to operate in Valencia County, Living Cross suffered heavy financial losses. The hearing examiner reasonably found that Living Cross's underlying financial troubles predated AMR's initial entry in April 2013 and were not caused by AMR.

{29}     We conclude that contrary to Living Cross's contentions, the PRC *did* adequately consider the financial impact to Living Cross of granting AMR's application. In so doing, the PRC did not abuse its discretion by concluding that AMR's entry had a "limited incremental financial impact" on Living Cross, and then finding that the impact was outweighed by the need for an additional service provider as a result of Living Cross's inability to provide reasonably continuous and adequate service.

**7.     The PRC was not obligated to give AMR supplemental authority rather than granting its application**

{30}     Finally, Living Cross contends that the PRC should have modified its certificate to AMR to only allow AMR to operate when Living Cross's fleet was fully deployed. As an initial matter, Living Cross does not offer any legal basis that would make it error for the PRC to refuse to grant supplemental authority in lieu of the

operating authority sought in the application in this case. Instead, Living Cross broadly contends that granting AMR only supplemental authority would be consistent with the policy of the Motor Carrier Act, and points to its cross-examination of a PRC expert witness who acknowledged that he had not considered allowing AMR to provide services only when Living Cross ambulances were not available. Living Cross argues that the PRC failed to consider this alternative, which is not so. The PRC specifically addressed granting AMR only supplemental authority and rejected it because Living Cross's supplemental authority proposal was unclear, and no such alternative was put forth by any of Living Cross's witnesses. Based on the briefing before the PRC, the PRC reasonably determined that this alternative was vague and properly rejected it.

**CONCLUSION**

{31}     For the foregoing reasons, the PRC's decision is affirmed.

{32}     **IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

25

_____

**CHARLES W. DANIELS, Chief Justice**


_____

**PETRA JIMENEZ MAES, Justice**


_____

**BARBARA J. VIGIL, Justice**


_____

**JUDITH K. NAKAMURA, Justice**

26